1

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)

2
  stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700

3
Chicago, IL 60606
(312) 705-7400

4

**HAGENS BERMAN SOBOL SHAPIRO LLP**

5
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com

6
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

7
(510) 725-3000

8
*Interim Co-Lead Consumer Class Counsel*

9
[Additional counsel listed on signature page]

10
**UNITED STATES DISTRICT COURT**

11
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

12

| | |
|---|---|
| MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO, on behalf of themselves and all others similarly situated, | Consolidated Case No. 5:20-cv-08570-LHK |
| | The Hon. Lucy H. Koh |
| Plaintiffs, | **CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT** |
| vs. | |
| FACEBOOK, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |
| This Document Relates To: All Actions | |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ...............................................................1

II.    PARTIES .............................................................................................5

    A.    Defendant ...................................................................................5

    B.    Plaintiffs ....................................................................................6

III.   JURISDICTION, VENUE, INTRADISTRICT ASSIGNMENT, AND CHOICE OF LAW ...................................................................................8

IV.   FACTUAL ALLEGATIONS .................................................................9

    A.    General Background on the Social Media Industry ...................................9

    B.    General Background on Facebook .....................................................11

    C.    Facebook is Dominant in the Social Network and Social Media Relevant Markets. ...................................................................................15

        1)    The Social Network Market ......................................................15

        2)    The Social Media Market .........................................................22

        3)    Relevant Geographic Market ....................................................25

        4)    The Social Network and Social Media Markets Feature High Entry Barriers ...........................................................................25

    D.    Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring Market Power) by Deceiving Consumers about Its Privacy Practices. ...................................................................................31

    E.    The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception. .................................................................42

    F.    Facebook Uses Anticompetitive Acquisitions and Threats to Destroy Competition in the Social Network and Social Media Markets. ..........................47

        1)    Facebook's Tracking of Consumers Drove Its Copy, Acquire, or Kill Strategy. ....................................................................47

        2)    Facebook Threatened Competitors with Discriminatory Practices to Help Drive its Anticompetitive Acquisition Strategy. ...............................51

               Instagram .........................................................................56

               Snapchat ..........................................................................59

               WhatsApp .........................................................................61

               Other Examples of Facebook's "Copy, Acquire, Kill" Strategy ...............62

G.   Facebook's Use of Onavo Comes to Light. ...........................................63

H.   Facebook's Anticompetitive Practices Have Harmed and Continue to Harm
     Competition in the Social Network and Social Media Markets...........................65

I.   Facebook's Anticompetitive Conduct Has Directly and Quantifiably
     Damaged Consumers. ...........................................67

V.    STATUTE OF LIMITATIONS ...........................................71

     A.   Accrual of Claim ...........................................71

     B.   Equitable Tolling...........................................72

     C.   Fraudulent Concealment ...........................................73

     D.   Continuing Violations and Ascertainment of Damages...........................78

VI.   CLASS ACTION ALLEGATIONS ...........................................78

VII.  INTERSTATE TRADE AND COMMERCE...........................................81

VIII. CLAIMS FOR RELIEF ...........................................82

IX.   PRAYER FOR RELIEF...........................................90

X.    DEMAND FOR JURY TRIAL...........................................91

CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

1      1.     Plaintiffs, by their undersigned counsel, hereby bring this action against Defendant Facebook, Inc. ("Facebook"), individually and on behalf of a Class of similarly situated persons, and allege as follows:

## I.     PRELIMINARY STATEMENT

2.     Founded originally as a website that allowed college students to connect with friends on campus, Facebook has since expanded exponentially and today is both the largest social network and the largest social media company in the world. In July 2020, for example, Facebook reported 1.78 billion daily active users and 2.7 billion monthly active users for its Facebook social network alone. Including *all* of Facebook's primary product offerings—*e.g.*, Facebook, Instagram, Facebook Messenger, WhatsApp, and Oculus—Facebook commands 2.47 billion daily active users and 3.14 billion monthly active users. But Facebook did not, as it would have the public believe, obtain market dominance based on innovation and fair competition. Instead, Facebook has used its behemoth-status as a weapon to clear the field of any and all competitors that threaten to take away market share. Facebook has done so by engaging in a two-part anticompetitive scheme that originated many years ago but continues to this day, and which has the net effect of destroying competition and harming consumers.

3.     First, set on utter domination, Facebook consistently and intentionally deceived consumers about the data protections it provided to its users, in order to diminish competition and obtain dominance in markets characterized by strong network effects and high barriers to entry. During the early days of social networks, Facebook recognized that promising users stringent privacy protections was necessary for it to win the race for market adoption. Accordingly, many users chose Facebook over other competing networks due to Facebook's stated commitment to its users' privacy. In reality, however, Facebook concealed the scope of the data it harvested from consumers and the ways in which it used that data to squash competition. By the time Facebook's deception began to come to light in 2018, it was too late—Facebook had cheated its way to market dominance. Facebook's deceptions allowed the company to gain and then, over the years, illegally maintain a stranglehold on the Social Network and Social Media Markets (defined and discussed further below). And high barriers to entry, including strong network effects and high switching

CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

costs, bolstered Facebook's efforts to prevent actual and would-be competitors alike from challenging its monopolistic grip.

4.    Second, Facebook exploited the rich data it deceptively extracted from its users to identify nascent competitors and then "acquire, copy, or kill" these firms. Rather than competing on the merits, Facebook used the valuable consumer data that it was harvesting to identify incipient competitors with the most likely path to meaningful market share gains. Equipped with the valuable user data it led consumers to believe it was not gathering and would not use in this way, Facebook targeted its users' preferred alternatives for destruction. Facebook made clear that it would copy incipient competitors' innovations and discriminatorily shut off these firms' access to Facebook's valuable user data if they did not sell their businesses to Facebook first. The message to its competitors was explicit: sell at a bargain, or Facebook will go into "destroy mode." All of this was enabled by Facebook's deception.

5.    While Facebook's scheme—bolstered by its deception and its serial acquisitions—has allowed Facebook to evolve since Mark Zuckerberg founded the company in 2004, the basic economic relationship between Facebook and its users has not. When users sign up for a Facebook account, they agree to certain terms. Those terms lay out the economic exchange between Facebook and its users. Consumers give Facebook access to, and use of, certain types and amounts of personal data about themselves; Facebook allows users to access its social network and social media offerings and pledges to protect users' privacy. Facebook's current Terms of Service state:

> *Instead of paying* to use Facebook and the other products and services we offer, by using the Facebook Products covered by these Terms, *you agree* that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. *We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you*.[1]

Notably, Facebook suggests to users (even to this day) that the extent to which it utilizes their data is limited, and that the extent of the data collection is limited to Facebook's services themselves.

6.    The Terms of Service further state that "[i]n exchange [for access to Facebook's services] we need you to make [certain] commitments." Among those "commitments" is

---

[1] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed Apr. 15, 2021) (emphases added).

"[p]ermission to use your name, profile picture, and information about your actions with ads and sponsored content." The Terms then state that protecting user "privacy is central to how [Facebook has] designed [its] ad system." In other words, consumers give up personal information and agree to receive targeted advertisements on Facebook in exchange for access to Facebook's social network. Consumers do not agree to anything beyond that.

7.     Facebook derives enormous economic value from the data it harvests from consumers. In fact, Facebook itself touts the economic value of the data it harvests from consumers. Facebook sells ads targeted to users based on the personal data that it collects from them. And, Facebook specifically describes its massive advertising earnings in terms of average revenue per user ("ARPU") in its public filings. For 2019, Facebook reported that its ARPU was over $41.00 per user in the United States and Canada.[2] At over 200 million users in the United States, that amounts to over $8.2 billion in revenue that Facebook derived in a single year.

8.     Facebook's weaponization of user data and its strategy to "acquire, copy, or kill" competitors has been wildly successful at the expense of consumers. Facebook's anticompetitive scheme has lessened, if not eliminated, competition and harmed consumers.

9.     Facebook's destruction of competition has caused consumers to suffer substantial economic injury. Consumers give up something of material value when agreeing to use Facebook's products: their personal data and their attention. As Facebook's co-founder explained, "[Facebook] is not actually free, and it certainly isn't harmless. . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap."[3] User data and attention is then sold in measurable units to advertisers in exchange for money.

10.     Absent Facebook's anticompetitive scheme, fair competition would have required Facebook to provide consumers greater value in return for consumers' data on a market-wide basis, but Facebook instead took that data without providing adequate consideration to its users (*i.e.,* the members of the putative class in this action). That constitutes antitrust injury. Through its

---

[2] *Facebook Q4 2019 Results* at 4, available at https://kl.link/36yIY5J (last accessed Apr. 15, 2021).

[3] Chris Hughes, *It's Time to Break Up Facebook*, The New York Times (May 9, 2019), available at https://kl.link/3dUTshC (last accessed Apr. 15, 2021).

deception and the acquisitions enabled by its deception, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have received absent the reduction.

11.     Facebook's acquisition and maintenance of monopoly power continues to harm consumers.  Prior to Facebook's consolidation of the Social Network and Social Media Markets, a number of firms vigorously competed to win over consumers by offering competing products which differed in non-price attributes such as quality.  For instance, early social networks and social media companies, including Facebook, competed for market share by offering competing products to consumers which highlighted particular privacy features.  Absent Facebook's anticompetitive scheme, which has allowed Facebook to place consumers under its monopolistic thumb, competition from Facebook's rivals would require Facebook to give consumers greater value in exchange for their use of Facebook, through monetary consideration or higher quality offerings.  Instead, Facebook's anticompetitive conduct has allowed Facebook to artificially stifle innovation and deprive consumers of any meaningful alternative to Facebook's social network and social media empire.  As a result, consumers are faced with a "take it or leave it choice": accept a Facebook of lesser value and quality or forgo use of the only social network and social media offerings used by most consumers' friends and family members.

12.     Facebook's monopolistic conduct violates the antitrust laws and harms consumers.  Indeed, the United States House of Representatives Antitrust Subcommittee, the Federal Trade Commission ("FTC"), and various State Attorneys General have all recognized that Facebook has engaged in anticompetitive conduct.  A recent majority staff report from the House Antitrust Subcommittee details Facebook's pattern of anticompetitive conduct.  *See Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary (Oct. 6, 2020), available at https://kl.link/3jGISfK.  And, the FTC and 48 State Attorneys General have commenced civil antitrust lawsuits against Facebook.  *See State of New York et al v. Facebook, Inc.*, Case No. 1:20-cv-03589-JEB (D.D.C.); *Federal Trade Commission v. Facebook, Inc.*, Case No. 1:20-cv-03590-JEB (D.D.C.).

13.     Facebook is dominant in the Social Network Market and the Social Media Market, and it has engaged in predatory and exclusionary conduct in order to monopolize those markets, causing Plaintiffs and Consumer Class members to suffer substantial economic injury. This action seeks recovery for consumers' losses and Facebook's unlawful gains and appropriate equitable relief to prevent Facebook from continuing to destroy competition and harm consumers.

## II.    PARTIES

### A.    Defendant

14.     Founded by Mark Zuckerberg in 2004, Defendant Facebook, Inc. is a Delaware corporation with its principal place of business located in Menlo Park, California.

15.     Facebook is a social media company that provides online services to more than 3.14 billion users. Facebook owns and operates several business divisions, such as:

- Facebook.  Facebook's core social networking application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content, including a wide range of media and updates regarding the activities of the user's social connections. The News Feed also includes advertisements individualized for each person.

- Instagram.  Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook announced that it was acquiring Instagram in April 2012, consummating the acquisition later that year.

- Messenger.  Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across applications and devices.

- WhatsApp.  WhatsApp is a messaging application used by individuals and businesses. One of WhatsApp's primary selling points is the claim that it is more

1    private and secure than text messages or other messaging apps. Facebook acquired

2    WhatsApp in 2014.

3        16.    In exchange for providing services, Facebook collects user data, which it allows

4    advertisers to use for targeted advertising to Facebook users. Facebook's principal revenue is from

5    targeted advertising that it provides to advertisers. In 2019, Facebook collected $70.7 billion in

6    revenue, almost entirely from allowing companies to serve ads to its users.

7        17.    Facebook has over 50,000 employees and offices worldwide.

8    **B.    Plaintiffs**

9        18.    Plaintiff Maximilian Klein is a natural person and citizen of the State of Vermont

10   and a resident of Chittenden County.

11       19.    Plaintiff Klein created a Facebook account in 2006, maintains an active account, and

12   regularly uses Facebook. Plaintiff Klein has an active Instagram account and has maintained that

13   account since 2016. Plaintiff Klein uses Facebook's Messenger feature and actively uses a

14   WhatsApp account.

15       20.    Plaintiff Klein cares about his online privacy and trusted Facebook to protect his

16   privacy. But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack

17   of privacy protections and low-quality data privacy practices, he now does not trust Facebook to

18   protect his online privacy. Plaintiff Klein now does not like the invasiveness of Facebook and its

19   products. Despite this, Plaintiff Klein continues to use Facebook and its products because virtually

20   everyone he knows uses them and there are no other suitable alternatives to connect with his friends

21   and family.

22       21.    Facebook lied about its data privacy practices and the scope of the data it collected

23   and made available to third parties. If Plaintiff Klein had known the truth about Facebook's privacy

24   practices years ago, he would not have agreed to give Facebook access to as much personal data

25   about himself.

26       22.    Plaintiff Sarah Grabert is a natural person and citizen of the State of Illinois and a

27   resident of Cook County.

28

23.     Plaintiff Grabert created a Facebook account prior to 2007, maintains an active account, and regularly uses Facebook.  Plaintiff Grabert has an active Instagram account and has maintained that account since at least 2010.  Plaintiff Grabert uses Facebook's Messenger feature and has used a WhatsApp account.

24.     Plaintiff Grabert cares about her online privacy and trusted Facebook to protect her privacy.  But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, she now does not trust Facebook to protect her online privacy.  Plaintiff Grabert now does not like the invasiveness of Facebook and its products.  Despite this, Plaintiff Grabert continues to use Facebook and its products because virtually everyone she knows uses them and there are no other suitable alternatives to connect with her friends and family.

25.     Facebook lied about its data privacy practices and the scope of the data it collected and made available to third parties.  If Plaintiff Grabert had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook to as much personal data about herself.

26.     Plaintiff Rachel Banks Kupcho is a natural person and citizen of the State of Minnesota and a resident of Hennepin County.  Plaintiff Banks Kupcho created a Facebook account in approximately 2008, maintains an active account, and regularly uses Facebook.  Plaintiff Banks Kupcho actively uses her Instagram account, Facebook's Messenger feature, and her WhatsApp account.

27.     Plaintiff Banks Kupcho cares about her online privacy and trusted Facebook to protect her privacy.  But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, she now does not trust Facebook to protect her online privacy.  Plaintiff Banks Kupcho now does not like the invasiveness of Facebook and its products.  Despite this, Plaintiff Banks Kupcho continues to use Facebook and its products because virtually everyone she knows uses them and there are no other suitable alternatives to connect with her friends and family.

28. Facebook lied about its data privacy practices and the scope of the data it collected and made available to third parties. If Plaintiff Banks Kupcho had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook to as much personal data about herself.

### III. JURISDICTION, VENUE, INTRADISTRICT ASSIGNMENT, AND CHOICE OF LAW

29. This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Consumer Class resulting from Facebook's restraints of trade and monopolization of the Social Network and Social Media Markets described herein.

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (class action diversity jurisdiction), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust). The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

31. This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to persons throughout the United States, including in this District. Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

32. Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

33. This action is properly assigned to the San Jose Division of this District, pursuant to Civil Local Rule 3-2(c), because antitrust class actions may be assigned on a district-wide basis.

34.     To the extent there is a choice of law, Facebook's "Terms of Service" provide that "the laws of the State of California" govern "any claim" between Facebook and its users that "arises out of or relates to "the Facebook Products[.]"[4]

## IV.     FACTUAL ALLEGATIONS

### A.     General Background on the Social Media Industry

35.     At a high level, the various participants in the social media industry include the following: social media applications, social networks, consumers, advertisers, and content providers (which can be any of the previous types of market participants, or can be third parties).

36.     Social media applications provide limited access to user-generated content—such as text posts or comments, digital photos or videos, and data generated through online interactions. Indeed, social media applications often focus, at least initially, on a particular form of media.[5] Twitter, for example, developed as an application for broadcasting users' short text messages (originally limited to 140 characters, and which now allows for up to 280 characters). YouTube facilitates the sharing of videos of varying temporal length, while TikTok allows for the sharing of short-form videos of limited temporal length. Instagram distinguishes itself as an application for the sharing of photos and, to a lesser extent, videos.

37.     A social *network*, on the other hand, is distinct from a social media application. While social media applications often facilitate the sharing of a distinct form of content—*i.e.*, photographs (Instagram), short text messages (Twitter), disappearing messages (Snapchat), or short-form videos (TikTok)—social networks (such as Facebook, and, previously, Myspace, Friendster, Orkut, Flip.com, Bebo, and Google+) combine these and other individual features and allow their users to access them as part of one, multi-function product. In addition, social networks typically allow users on their networks to connect and interact with a full spectrum of the users'

---

[4] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed Apr. 15, 2021).

[5] House Report, *supra*, at 89–90 ("Social media companies may also focus on attracting particular types or groups of consumers to differentiate themselves from larger companies. . . . Given Facebook's dominance, the primary way for new entrants to compete is to attract a subgroup or niche.").

social connections (including people the users already know), participate in "groups" which join together users with a particular background or common interest, and display content through linear feeds.[6] Facebook's social network—which allows users to interact with others, join and participate in groups, and display a wide variety of content linearly—is pictured below:[7]



38. Social networks and social media applications typically offer their services to consumers for non-cash consideration.[8] In consideration for providing services, social networks and social media applications obtain valuable personal data from their users. The extent of the information obtained from users varies by social network and by social media application, as do the disclosures about what data is obtained and the uses to which it is subsequently put.

39. Social networks and social media applications monetize the data they obtain from users by selling access to the data to third parties. As the FTC's former Chief Technologist has explained with respect to Facebook in particular, "personal information . . . is given to the platform,

---

[6] House Report, *supra*, at 88.

[7] *See* Kessica Guynn, *Facebook is making a big change to your news feed*, USA TODAY (Jan. 11, 2018), available at https://www.usatoday.com/story/tech/2018/01/11/facebook-newsfeed-big-change/1023331001/ (last accessed Apr. 15, 2021).

[8] House Report, *supra*, at 88.

1  mined, and then resold to or reused by third-party developers to develop apps, or resold to

2  advertisers to advertise with."[9]   To illustrate, advertisers, product manufacturers, and service

3  providers often pay social networks and social media applications to direct curated ads specifically

4  towards particular user segments.

5  **B.   General Background on Facebook**

6        40.   Facebook's core offering to consumers is access to its social network, which

7  contains the individualized profiles of well over 200 million users in the United States and billions

8  of users worldwide and integrates with it Facebook's various social media offerings.  In exchange

9  for access to the only social network that allows consumers to connect online with most of their

10  family, friends, and acquaintances, Facebook requires users to provide their personal data and

11  receive targeted advertisements.

12       41.   Facebook uses the data obtained from its massive user base to generate its largest

13  source of income: selling targeted advertisements to its users.  Indeed, Facebook publicly

14  acknowledges that "[w]e generate substantially all of our revenue from advertising."[10]  In 2019,

15  Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve

16  targeted ads to its users.

17       42.   Facebook's machine learning algorithms mine patterns in the data for advertisers,

18  which allows advertisers to reach precisely the right audience to convert into sales, user signups,

19  or the generation of sales leads.  To protect its control over user data, Facebook has brought legal

20  action against actors that have copied publicly available user data and made it available outside of

21  Facebook, demonstrating that Facebook recognizes the value of this data.[11]

22       [9] United Kingdom House of Commons, Digital, Culture, Media and Sport Committee,

23  *Disinformation and 'Fake News': Final Report*, 2017-19, HC 1791, ("DCMS Report") (Feb. 14,
    2019), at ¶ 128, available at https://kl.link/37MnyDf (last accessed Apr. 15, 2021).  Indeed, as the

24  U.K. House of Common's Digital, Culture, Media and Sport Committee has recognized, "[i]n
    portraying itself as a free service, Facebook gives only half the story."  *Id.*

25       [10] Form 10-K Filing for Facebook, Inc., Securities and Exchange Commission, available at

26  https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm
    at 42 (last accessed Apr. 18, 2021) (emphasis added).

27       [11] Facebook brought one such suit as recently as November 19, 2020.  *See* Jessica Romero,

28  *Combating Clone Sites*, Facebook Newsroom (Nov. 19, 2020), available at
    https://about.fb.com/news/2020/11/combating-clone-sites/ (last accessed Apr. 15, 2021).

43.     The data is also monetized by commercializing access—for example, by providing application developers, content generators, and advertisers with direct access to the information embedded in Facebook's network, such as the interconnection between users, user attributes, and user behavior.  That data can then be used by these third parties.

44.     From the beginning, Facebook has sought to entice consumers based on its supposed commitment to maintaining the privacy of its users' data.  Unlike earlier competing social networks that allowed anyone interested to join anonymously or by using unverified usernames, Facebook required that those interested in joining use their real-world identities.

45.     This qualitative distinction had clear privacy implications.  Ironically, early applications that allowed users to register anonymously or with pseudonyms caused more privacy problems for users because wrongdoers that obtained and/or used fellow users' personal information could hide behind their online (anonymous or unverified) identities.

46.     In contrast, Facebook claimed that it created a level of accountability, because users ostensibly knew who was on the other side of the screen from them and were connected to them in some way in real life.  Indeed, Facebook's website "was one of the first social networks where users actually identified themselves using their real names."[12]  By making users "real," Facebook claimed (and users agreed by voting with their feet) that their social interactions online were better protected and more meaningful.  But all of this required Facebook to promise privacy protection in order to induce users to provide their real-world identities and data.

47.     Mark Zuckerberg learned the importance of privacy to consumers early on.  While a student at Harvard University, Mr. Zuckerberg created "Facemash," which "juxtaposed the pictures of two random Harvard undergraduates and asked users to judge their physical attractiveness."[13]  Facemash used the students' photos without their permission, "dr[a]w[ing] the

---

[12] *See* John Gallaugher, Getting the Most Out of Information Systems § 8.3, available at https://kl.link/3dX3BKN (last accessed Apr. 15, 2021).

[13] Alan J. Tabak, *Hundreds Register for New Facebook Website*, The Harvard Crimson (Feb. 9, 2004), available at https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/ (last accessed Apr. 15, 2021).

ire of students and administrators alike[.]"[14]  While promoting "thefacebook.com," Facebook's predecessor, Zuckerberg vowed that he had learned from his experience with Facemash and would build into "thefacebook.com" "intensive privacy options," which "he hoped would help to restore his reputation[.]"[15]   In reality, thefacebook.com's—and later Facebook's—representations regarding privacy were part of an orchestrated scheme, designed to secure and prolong monopoly status.

48.    At first, Facebook was closed to all but those users who could validate their own real-world identities, such as by verifying that their identities were legitimate via an e-mail address issued by an organization, such as a university or a firm:[16]

> It was this "realness" that became Facebook's distinguishing feature—bringing along with it – and also depending on – a perceived degree of safety and comfort that enabled Facebook to become a true social utility and build out a solid social graph consisting of verified relationships.  Since "friending" (which is a link between nodes in the social graph) required both users to approve the relationship, the network fostered an incredible amount of trust.  Today, many Facebook users post their cell phone numbers and their birthdays, offer personal photos, and otherwise share information they'd never do outside their circle of friends.

49.    The data Facebook has since collected derives much of its value from the ability to identify Facebook's users by their real-world identities.  Other applications, such as Twitter, have only loosely enforced identity rules, and have never required users to disclose granular details about themselves.

50.    Facebook characterizes each user's disclosure of his or her identity as increasing the value of the experience for all users, who are purportedly able to benefit from others' disclosures by connecting with and following the activities of their real-world connections.[17]  Disclosure also

---

[14] Id.

[15] Id.

[16] Gallaugher, supra, § 8.3.

[17] Apple's Senior Director for Global Privacy recently expressed skepticism that social networks and social media applications like Facebook encourage disclosure of personal information solely to create a richer "personalized experience" for other users.  See Apple Privacy Letter, November 19, 2020, available at https://kl.link/33bhK2Y (last accessed Apr. 15, 2021) ("What some companies call 'personalized experiences' are often veiled attempts to gather as much data as possible about individuals, build extensive profiles on them, and then monetize those profiles.").

increases the market value of the data Facebook obtains from its users. Knowing the internet habits of "YankeesFan123" is less valuable than knowing the browsing habits of a specific individual whose love of the Yankees can be linked with data about his shopping habits, income, family, friends, travel, dining, dating, and myriad other data points.

51. In the years since its inception, Facebook has tracked trillions of data points about consumers with a powerful data structure it calls the "social graph." The social graph "refers to Facebook's ability to collect, express, and leverage the connections between the site's users, or as some describe it, 'the global mapping of everyone and how they're related.'"[18] All of the data on Facebook can be thought of as a "node" or "endpoint" that is connected to other data on Facebook:

> You're connected to other users (your friends), photos about you are tagged, comments you've posted carry your name, you're a member of groups, you're connected to applications you've installed—Facebook links them all.[19]

52. Given Facebook's size and reach, as well as the extent of its surreptitious data collection, the social graph is a unique and uniquely valuable data set, even among the giants of the tech world. Much of this value stems from the fact that the majority of Facebook's social graph cannot be viewed by the public or search engines and contains extraordinary amounts of data that users unwittingly provided Facebook regarding their most granular everyday habits.

53. Facebook is a so-called "walled garden"—a closed ecosystem run by a single operator. Advertisers must go through Facebook in order to reach Facebook users. And Facebook can decide how much of its social graph it allows advertisers and app developers, including competitors, to access.

54. The personal data of Facebook's users takes many forms including data about the information users share on their personal profile pages, the photos and profiles users have viewed, what information users share with others, and even what users put in messages to other users. These granular data allow targeted advertising on a scale that has never before existed. Facebook's

---

[18] Gallaugher, *supra*, (quoting Alex Iskold, "Social Graph: Concepts and Issues," ReadWriteWeb, September 12, 2007).

[19] *Id.* (citing Alan Zeichick, "How Facebook Works," Technology Review, July/August 2008).

products allow advertisers to target Facebook's user base by their attributes and behavior. Third party advertisers have been able to use Facebook's products to track and target consumers throughout the internet, even when Facebook users are "logged-out" of Facebook.

**C.  Facebook is Dominant in the Social Network and Social Media Relevant Markets.**

55.      There are two relevant markets applicable to this dispute. They are: (1) the Social Network Market; and (2) the Social Media Market. The House Antitrust Subcommittee has recognized both the Social Network Market and the Social Media Market as relevant markets.[20] Facebook has unlawfully acquired and maintained monopoly power in both markets.

**1)      The Social Network Market**

56.      The Social Network Market is the product market consisting of social networks, which are websites and applications that allow users to find, communicate, and interact with friends, family, personal acquaintances, and other people with whom the users have shared interests or connections. Examples of social networks include (among others) Facebook—and, while they existed—Myspace, Friendster, Orkut, Flip.com, Bebo, and Google+. A social network is distinct from a social media application, although a social media application may offer a limited part of the wide array of functions and connections of a social network. To that extent, as explained more fully below, the Social Network Market is a distinct part or sub-part of the Social Media Market.

57.      Social networks feature several key elements which distinguish them from other services, including social media applications. First, social networks provide their users a "rich social experience" based on a social graph.[21] A social graph connects users to a wide array of people, which is both extensive in number and vast in scope, reflecting the full range of connections that users have in the real world. This wide array includes people whom the users already know in real life (such as friends, family members, neighbors, community members, and other acquaintances), as well as people whom the users do not yet know, but whom are associated with the users' other real-world acquaintances (such as a friend of a friend) or share some characteristic

---

[20] House Report, *supra*, at 90–91.

[21] *Id.* at 91.

with the users (such as interests or background).  Many social networks encourage their users to expand their networks by suggesting new people the users may connect to.

58.    Second, social networks provide substantive features to users which facilitate a wide array of interaction among the wide array of people that make up a user's social graph, which reflects the full range of interactions that users have in the real world.  To illustrate, social networks allow users to share content—including text posts, photos, videos, and other content matter— among their connections.  And if, for instance, Sarah shares a picture with all of her connections on a social network, including with Tom and Jerry, a social network may allow Tom and Jerry to engage with each other through their shared connection to Sarah, even if Tom and Jerry do not already know each other.  Social networks provide additional substantive features which facilitate users finding and engaging with each other, such as the ability to create and participate in groups, which bring together individuals with common backgrounds (such as graduates of a particular school), common interests (such as in a particular cuisine or in a specific film franchise), and common hobbies (such as restoring classic cars).  As another example, social networks may also allow users to organize events among the wide array of people that make up the users' social graphs, including the abilities to create pages with information about an event, curate an invitation list, and send and monitor invitation lists.  Some social networks even allow users to play online games with their connections.

59.    Third, social networks provide users with the convenience of a "one-stop shop." Social networks combine multiple substantive features and functionalities into one product, in a way that firms that may offer one individual feature do not.  Mark Zuckerberg, Facebook's founder, has recognized the multi-functionality of Facebook as a distinct and important feature, explaining: ". . . there are so many different things that you can do. . . . Pretty much anything that you would want to do with a number of people at once, you can do in that digital equivalent of the town square."[22]

---

[22] *Interview with Facebook CEO Mark Zuckerberg*, ABC News (Apr. 4, 2019), available at https://abcnews.go.com/Business/interview-facebook-ceo-mark-zuckerberg-transcript/story?id=62152829 (last accessed Apr. 19, 2019).

60.     There are no reasonable substitutes for social networks.  Other applications either do not provide for social interaction with a network of people or provide only a single or limited part of the wide array of functions and connections of social networks.  Search engines, such as Google, Yahoo, or Bing, are not "social networks" because they do not provide for interaction between application users.  Similarly, apps like Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or text messages, are not social networks because although they provide for interaction, they do so only in a device-to-device manner, among a limited number of the user's contacts (such as those in the user's address book), on a certain operating system, and focus solely on delivering messages rather than facilitating a broader online social experience.[23]

61.     Still other types of online networks, such as LinkedIn, are not "social networks," as that term is defined in this complaint, because they are used for a different purpose, and are used in parallel to—rather than instead of—social networks.  Whereas LinkedIn is typically considered the dominant professional online network in the world, it is not a replacement for social networks such as Facebook.  This is because LinkedIn is used primarily by a narrow array of contacts for professional networking and employment-seeking purposes, while Facebook and its like are used primarily for non-professional, personal purposes.[24]

62.     Various governmental entities have recognized that LinkedIn is not a replacement for social networks, including Facebook.[25]  During its review of the Microsoft/LinkedIn merger,

---

[23] Facebook itself has noted this distinction, explaining in documents provided to the House Antitrust Subcommittee that whereas the growth of Apple's iMessage is "limited by the adoption of iPhones, . . . Facebook's products can be used across devices."  *Id.* at 136 n.752.

[24] Facebook has, itself, recognized this distinction in documents it provided to the House Antitrust Subcommittee.  *See id.* at 133–34 n.733 ("Linkedin . . . coexist[s] in the US with similar user bases but orthogonal graphs: Facebook connects friends and family, LinkedIn connects coworkers[.]").

[25] In their respective antitrust suits against Facebook, for example, the FTC and various State Attorneys General have all asserted that LinkedIn is not a substitute for social networks like Facebook.  *State of New York et al v. Facebook, Inc.*, Case No. 1:20-cv-03589-JEB (D.D.C.), Dkt. 70, ¶ 34; *Federal Trade Commission v. Facebook, Inc.*, Case No. 1:20-cv-03590-JEB (D.D.C.), Dkt. 51, ¶ 58.

the European Commission explained: "the reasons for using a [professional service network] are different from those for using a personal social network. While the former is used to '*1. Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in touch*', the latter is used to '*1. Socialize, 2. Stay in touch, 3. Be entertained, 4. Kill time'*."[26] Thus, users will have *both* a LinkedIn and a Facebook account, not one or the other, and this other type of network is not viewed or treated as a substitute for a social network.[27]

63.     LinkedIn itself has recognized social networks are a distinct product.[28]  It has, for example, explained the differences between "personal networks" (*e.g.*, Facebook) and "professional networks" (*e.g.*, LinkedIn):[29]



64.     Similarly, LinkedIn has recognized the distinct content that social network users expect to see when visiting a given social network:[30]

---

[26] European Commission, *Case M.8124 – Microsoft/LinkedIn* (June 12, 2016) at ¶ 106, available at https://ec.europa.eu/competition/mergers/cases/decisions/m8124_1349_5.pdf (last accessed Apr. 15, 2021) (emphases in original).

[27] In addition to recognizing LinkedIn's distinct professional networking purpose, the House Antitrust Subcommittee's recent report also distinguished LinkedIn from social networks, like Facebook, on the basis of LinkedIn's economic model.  Whereas users pay for social networks like Facebook with their data, time, and attention, some features of LinkedIn, such as "LinkedIn Premium," further require users to pay a monetary fee.  *See* House Report, *supra,* at 88.

[28] *See* LinkedIn, *The Mindset Divide* (Sept. 2012), available at https://business.linkedin.com/content/dam/business/marketing-solutions/global/en_US/site/pdf/wp/linkedin-marketing-solutions-mindset-divide.pdf (last accessed Apr. 15, 2021).

[29] *Id.* at 4.

[30] *Id.* at 6.

65. Social media applications, such as YouTube and TikTok, are likewise not reasonable substitutes for social networks. Indeed, the House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized the distinction between the Social Network Market and the Social Media Market and that "the specific demand for social networks is fundamentally different from the demand for other social media."[31] That is because users utilize each for different purposes: social networks "facilitate their users finding, interacting, and networking with other people they already know online," whereas social media applications "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers."[32] Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections.[33] Similarly, a user that finds a funny video of a celebrity (or other stranger) on YouTube may choose to encourage their friends and family to view that video by sharing it with them on Facebook with a note:[34]

---

[31] House Report, *supra*, at 91.

[32] *Id.* at 91.

[33] *See* Administrative Proceedings, Bundeskartellamt, B6-22/16 ("German Federal Cartel Office Report") ¶ 312 (Feb. 6, 2019), available at https://kl.link/39AxErE (last accessed Apr. 15, 2021) ("YouTube is hardly ever used for other purposes (*e.g.* contacts to friends, messaging, looking for people the user knows, share contents")).

[34] Meira Gebel, *How to post a YouTube video on Facebook in several different ways, using YouTube's 'Share' feature*, Business Insider (Aug. 23, 2019), available at https://www.businessinsider.com/how-to-post-a-youtube-video-on-facebook (last accessed Apr. 15, 2021).



66.    Additional factors make clear that social media applications are used in parallel to—rather than instead of—social networks.   For one, many consumers use both YouTube and Facebook, rather than one over the other.[35]  Social media applications make it easy for a user to share the content he or she finds on a social media application using his or her social network account.   By clicking the "SHARE" button that appears underneath a video on YouTube, for example, YouTube pre-populates a hyperlink of the video that the user may then easily copy and paste on Facebook:[36]



67.    In addition, social networks, such as Facebook, provide specific product features to users which social media applications generally do not provide at all, much less in a "one-stop

---

[35] Federal Cartel Office Report, *supra*, ¶ 318 (noting that "Facebook.com and YouTube are increasingly used in parallel," and that a "large number of [users utilize] YouTube without registration and thus solely for viewing videos.").

[36] Gebel, *supra*.

shop."[37]  Social media applications, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

68.     Since its initial market entry, in which it competed with early social networking companies such as Myspace and Friendster, Facebook has become dominant.  Myspace has since ceased operating a social network—announcing that it "would no longer try to rival Facebook in social networking" and that it instead hoped to build a "social entertainment" site—while Friendster is defunct altogether.[38]  Facebook, by contrast, has over 2.7 **billion** users worldwide, which is 42% of the global population (excluding China), including over 200 million users in the United States.  As described in one recent article, "Facebook has been and remains the undisputed king of the social network market," while other social networks—such as Diaspora—constitute "only a very small drop in the ocean compared to Facebook."[39]

69.     There is both direct and indirect evidence of Facebook's market power in the Social Network Market.  An internal study conducted by Facebook itself concluded that "[f]or hundreds of millions of people today who want to connect with their friends and family, [Facebook is] the first—and more importantly—**only** choice."[40]

70.     As the House Antitrust Subcommittee recently recognized, "the degree to which platforms have eroded consumer privacy without prompting a response from the market" is "evidence of platform market power[.]"[41]  Indeed, a social network's "ability to maintain strong

---

[37] House Report, *supra*, at 91, 139 (noting that YouTube "is primarily used to consume video content online.  It does not provide the core functionality of Facebook . . . such as Pages, Marketplace, or limited sharing within a person's network.").

[38] Whitney Kimball, *Why These Social Networks Failed So Badly*, Gizmodo (Aug. 19, 2019), available at https://gizmodo.com/why-these-social-networks-failed-so-badly-1836996164 (last accessed Apr. 19, 2021).

[39] *What are the best alternatives to Facebook?*, IONOS Digital Guide (Jan. 14, 2021), available at https://www.ionos.com/digitalguide/online-marketing/social-media/the-best-facebook-alternatives/ (last accessed Apr. 19, 2021).

[40] *State of New York et al v. Facebook, Inc.*, Case No. 1:20-cv-03589-JEB (D.D.C.), Dkt. 70, ¶ 242 (emphasis added).

[41] House Report, *supra*, at 51.

networks while degrading user privacy can reasonably be considered equivalent to a monopolist's decision to increase prices or reduce product quality."[42]  Thus, "[a] firm's dominance can enable it to abuse consumers' privacy without losing customers."[43]  Tellingly, during sworn testimony before the United States Congress regarding Facebook's data privacy lapses, Mark Zuckerberg—Facebook's founder and Chief Executive Officer—repeatedly struggled to name a single direct competitor to Facebook to whom consumers could turn.[44]

71.    As discussed more fully below, Facebook's market share in the Social Network Market is higher than its share in the Social Media Market and, in any event, exceeds 65%.  In addition to this demonstrably high market share, Facebook has held this dominant share for years with high barriers to new entry (discussed further below).  There is a reason a movie about Facebook is entitled, "*The* Social Network"; Facebook is far and away the dominant player in that market.

2)    **The Social Media Market**

72.    The Social Media Market is the product market consisting of social media applications and tools, which are websites and mobile applications that allow users of a given application to distribute various forms of media—such as text messages, photos, videos, and music—to other users of the same application.

73.    Search engines, such as Google, Yahoo, or Bing, are not social media applications.[45] That is because users primarily utilize search engines to find information that exists external from the search engine.  A user might use Microsoft's Bing to search for "The New York Times" in order to find The New York Time's URL web address: "www.nytimes.com."  By contrast, a user

---

[42] *Id.* at 52.

[43] *Id.*

[44] Sarah Jeong, *Zuckerberg struggles to name a single Facebook competitor*, The Verge (Apr. 10, 2018), available at https://www.theverge.com/2018/4/10/17220934/facebook-monopoly-competitor-mark-zuckerberg-senate-hearing-lindsey-graham (last accessed Apr. 19, 2021).

[45] Relatedly, the United States Department of Justice ("DOJ") recently recognized that search engines are not "social media" in its recent antitrust complaint against Google.  *See United States et al., v. Google LLC*, 1:20-cv-03010 (D.D.C.), Dkt. 1, ¶ 90 ("[P]latforms . . . are not reasonable substitutes for general search services.").

1  would utilize a social media application—such as YouTube—to find a video hosted on *that* social

2  media application.

3       74.    Other forms of online entertainment are not reasonable substitutes for social media

4  applications because of the unique characteristics a social media application provides. TikTok, for

5  example, allows "users to express their ideas by sharing short videos with a broader community."[46]

6  By contrast, other services—including online cardrooms such as PokerStars—provide online

7  entertainment, but do so by means other than facilitating the distribution of various forms of media,

8  such as text messages, photos, videos, or music.

9       75.    User behavior also confirms that social media applications are complements to other

10  types of online services and entertainment. Indeed, users utilize social media applications in

11  parallel to other online services and entertainment. A user may, for example, watch a Hulu-

12  produced show on Hulu, but use YouTube to share an amateur video review of that Hulu show.

13      76.    In addition, social media applications offer an economic model that is distinct from

14  the economic models employed by other providers of other forms of online services and

15  entertainment, to the extent that the economic model may allow the option of not charging the user

16  a monetary fee. Indeed, many social media applications may not charge users a monetary price for

17  access to their applications, but subject the users to ads (for which advertisers monetarily

18  compensate the companies) or require the users to give up some form of limited data. By contrast,

19  other providers of online services and entertainment may collect from users a per-use monetary fee

20  or a regularly-occurring (monthly or annual) fee, but, as a result, may not serve them ads or may

21  not collect their data.

22      77.    Direct evidence of Facebook's monopoly power in the Social Media Market is

23  bountiful. For example, in an internal presentation prepared for Sheryl Sandberg, Facebook's Chief

24  Operating Officer, Facebook maintained that "[t]he industry consolidates as it matures" and that

25  "Facebook is now 95% of all social media in the US[.]"[47]  In another internal presentation,

26

27  ─────────────────
     [46] House Report, *supra*, at 91.

28      [47] House Report, *supra*, at 138.

Facebook noted that "[i]n every country we've tipped, we have maintained [market] penetration," and it expressed skepticism that other firms could compete with Facebook.[48]

78.   In addition to direct evidence, there is also irrefutable indirect evidence of Facebook's market power in the Social Media Market.  Facebook is by far the largest social media company, and its market share exceeds 65%.  In the United States, Facebook's products include three of the seven most popular mobile apps, measured by monthly active persons, reach, and percentage of daily and monthly active persons.[49]  Indeed, the House Antitrust Subcommittee's recent report revealed that "[a]ccording to Facebook's internal market data, its users spend significantly more time on its family of products than on competing services."[50]

79.   Firms in the Social Media Market generate virtually all of their value to shareholders in the form of advertising revenue.  Social media applications allow advertisers to use data about an application's users in order to deliver targeted advertisements to consumers.

80.   Facebook, Twitter, Snapchat, and other social media companies all compete for the attention and data of their users, which they then convert into revenue by selling advertising. Accordingly, one of the best available metrics of market share in the Social Media Market is advertising revenue.  As reflected by its advertising revenue, Facebook (including Instagram) has over 85% of the U.S. market, with the second-place competitor, Twitter, claiming *less than 3.5%* market share.

81.   Notably, one or more of Facebook services are considered a "must have" for most users, whereas other social media applications are not.[51]  This means that most social media users that are users of competing social media applications still have an account on a Facebook service (if not all of them), which further means that Facebook's advertising revenues are a conservative estimate of its already obviously-dominant market share.

---

[48] *Id.* at 139.

[49] *Id.* at 136.

[50] *Id.* at 137–38.

[51] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens*, CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Apr. 15, 2021).

### 3) Relevant Geographic Market

82. The United States is the relevant geographic scope of both the Social Media Market and the Social Network Market. Social media applications each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States. For example, neither Facebook nor competing social media applications, such as YouTube, limit the offering of their services to residents of San Jose, California, as opposed to residents of Little Rock, Arkansas. On the other hand—due to multiple factors, including access to broadband internet, switching costs, and consumer preferences—social media applications in other countries are not reasonably interchangeable with applications in the Social Media Market. To the extent that Facebook has competitors in the United States in the Social Network Market, the same is true in that market as well.

### 4) The Social Network and Social Media Markets Feature High Entry Barriers

83. Facebook's monopoly is durable because it operates in an industry with strong network effects and high barriers to entry.[52] A network effect is the phenomenon by which the value or utility a user derives from a good or service depends on the number of users of the same good or service. Network effects may be either direct or indirect. Direct network effects arise where a product or service becomes more valuable to users as additional others use the product or service. Indirect network effects exist when greater use of a product or service incentivizes third parties in a different customer group to also engage with that product or service.

84. As an example of direct network effects, take, for instance, a social media application, such as YouTube. Even if the application has the very best features, the product is worth comparatively little to a user if few other users utilize it to upload and view content. Consumers use video applications like YouTube to find and disseminate content: the more users who engage with it, the more valuable it becomes to each of them. The Social Media Market, therefore, exhibits clear and obvious direct network effects. The direct network effects in the Social Network Market are even stronger. Because users join a social network to interact with a large number of their acquaintances, a social network cannot survive by providing access to content

---

[52] *See* House Report at 37–45.

alone. Indeed, users will only utilize a given social network if it connects them with a large number of their social acquaintances, since "no person wants to be on a social network without other users."[53]

85. The powerful direct network effects inherent in the Social Network and Social Media Markets made competition at the early stages *for* the field rather than *within* the field.[54] The House Antitrust Subcommittee's recent report recognized this point as it relates to Facebook, explaining that Facebook's network effects are "very strong" and that "there are strong tipping points in the social networking market that create competition *for the market,* rather than competition within the market."[55] A similar phenomenon has since made itself clear in the Social Media market, such that even though users may prefer to shift to non-Facebook options as their *favorite* (*e.g.*, TikTok or Snap), they still engage most often with Facebook's social media offerings (*e.g.*, Instagram) because it is the dominant, "must have" social media application.[56]

86. The content generated by Facebook's user base also creates strong indirect network effects and, in turn, increases the value of the Facebook network to third parties, including developers and advertisers, and Facebook itself. Each photograph, relationship status, check-in, or post by a Facebook user rendered Facebook more valuable not only to users, but also to third parties, including advertisers and app developers, who seek to target content based on individuals' data. This feedback loop enabled Facebook to use its anticompetitive strategy of consumer deception and monopolistic merger conduct to achieve a scale—bolstered by revenue from third parties such as advertisers and app developers that were drawn to Facebook—which substantially foreclosed competition in the Social Network and Social Media Markets.

87. Markets that exhibit strong network effects tend to be "sticky," or accompanied by high switching costs. Once a significant number of users adopt a product, they will be reluctant to

---

[53] *Id.* at 41.

[54] *Id.*

[55] *Id.* (emphasis added).

[56] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens,* CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Apr. 15, 2021).

switch to even a superior competitive alternative, because the newer offering will not deliver as much value unless many other users make the switch simultaneously. This feature of network-effect markets produces a period of intense, early competition, after which a single, dominant player often becomes entrenched. Facebook itself suggested in an internal memorandum, with respect to social networks, "either everyone uses them, or no-one uses them."[57] A fair and level playing field during the initial phase of early competition is thus crucial to maximize consumer welfare, as is a level playing field if a new type of social media application arises that threatens to supplant the old.

88. Switching costs impose a barrier to entry. To induce a user to adopt a new product in a market that has high switching costs, a competitor must incur not only the expense of building a superior product, but also the added compensation to defray a user's cost of switching. An incumbent does not incur this added cost, retaining a cost advantage that is at least equal to the switching cost the competitor must absorb. Where switching costs are high, the incumbent's competitive advantage is high as well.

89. High switching costs in the Social Network and Social Media Markets have allowed Facebook to prolong its monopoly. Facebook users may be connected to one another exclusively through Facebook's network, leaving Facebook as the only method for users to remain in contact with one another. Faced with the possibility of losing contact with each other, Facebook users who would prefer to use another social media application or social network are largely prohibited from doing so because of these high switching costs.[58]

90. Similarly, the lack of portability of Facebook users' data presents an additional switching cost. To illustrate, "a user may upload a variety of data to Facebook, including photos and personal information, but (by Facebook's design) may not be able to easily download the data and move it to another social media site; instead, the user would have to start from scratch, re-uploading her photos and re-entering her personal information to the new platform."[59]

---

[57] House Report, *supra*, at 141.

[58] Srinivasan, *supra*, at 89.

[59] House Report, *supra*, at 42.

91.     Facebook's tentacle-like grasp on other applications and services likewise presents yet another switching cost for consumers.  For instance, users of the popular Spotify music streaming service frequently sign up for Spotify using their Facebook accounts.[60]  But users who enroll in Spotify using their Facebook accounts "can't disconnect it"—to use Spotify after leaving Facebook, users generally must set up new accounts on Spotify.[61]  In doing so, they lose access to their previous playlists, listening histories, connections with other users on Spotify, and other data.[62]  This discourages would-be defectors from leaving Facebook.

92.     Monopolists who seek to deceive consumers and destroy competition can often be disciplined by market forces.  A battery manufacturer, for example, that lies about the longevity of its batteries might be able to charge an unjustified premium price for a time.  But as soon as the manufacturer's deception is uncovered, consumers would quickly switch to a more fairly priced brand.  However, the robust network effects present in the Social Network and Social Media Markets impeded market forces from overcoming Facebook's market power once Facebook had anticompetitively secured its dominance.  Consumers who discovered in 2018 that Facebook had not actually been protecting their privacy as it promised could not easily switch to an alternative, because their friends and connections were all on Facebook.

93.     The Social Network and Social Media Markets feature other high barriers to entry, including significant initial investment.  Once a social network and social media application like Facebook has achieved dominant market share, the amount of capital investment that would be required to challenge Facebook's monopoly would be large.  A potential competitor would not only have to build its own vast network with features Facebook does not offer, but would also have to pay users' switching costs on a massive scale.

94.     The accumulation of data presents another significant barrier to entry in the Social Network and Social Media Markets.  Data has three defining properties which entrench the firms

---

[60] *Id.* at 146.

[61] *Id.*

[62] *Id.*

which accumulate it: volume, velocity, and variety.[63]  Social networks and social media applications that amass a large volume of data from users are able to analyze data in a way that applications that do not collect vast (or any) data are not.  Similarly, the velocity of data—the feedback loop between the collection and processing of data—allows social networks and social media applications to quickly identify and exploit the preferences, interests, activities, and contacts of their users.  And, the variety of data that social networks and social media applications are able to collect—including (among other things) a user's location, age, contact information, employment history, education level, computer-type, and relationship status—yields significant advantages that are difficult for potential competitors to overcome.

95.    Coupled with the network effects and high barriers to entry in the Social Network and Social Media Markets, Facebook's anticompetitive conduct allows it to extract supra-competitive rents from users in the form of personal data and attention and deliver minimum, suboptimal privacy protections and overall quality.  Without these effects, users would switch to a competing social network that offered users greater data privacy, presented users with fewer ads, or provided users with richer content, features, or monetary compensation.  Because of these barriers, however, Facebook has been able to reap supra-competitive profits from its anticompetitive conduct without the typical pressures of competition from existing competitors or new entrants.  And, Facebook has been able to control and increase the amount of consumer information and attention that it demands.

96.    Internal documents show that Facebook has been keenly aware of these market features.  An internal memorandum prepared in October 2018 by a senior data scientist and economist at Facebook recognized that the network effects of Facebook and its products are "very strong."[64]   In another presentation, Facebook described its network effects as a "flywheel," remarking that "[n]etwork effects make it very difficult to compete with us" and that its network

---

[63] Ed Dumbill, *Volume, Velocity, Variety: What You Need to Know About Big Data*, Forbes (Jan. 1, 2019), available at https://www.forbes.com/sites/oreillymedia/2012/01/19/volume-velocity-variety-what-you-need-to-know-about-big-data/?sh=50797c4d1b6d (last accessed Apr. 15, 2021).

[64] House Report, *supra*, at 13, 13 n.14.

effects get "stronger every day."[65]  Similarly, Facebook's founder, Mark Zuckerberg, has made clear Facebook's recognitions that "[t]here are network effects around social products"; there are "a finite number of different social mechanics to invent" and "being first is how you build a brand and a network effect."[66]

97.     Facebook's own documents show its awareness that due to strong network effects and market tipping, Facebook is much less concerned with competition from other social apps in the market like Snapchat or Twitter, than from competition within Facebook's *own* family of products—Facebook, Instagram, Messenger, and WhatsApp.[67]  In the case of messaging apps, Facebook's documents show that network effects can be even more extreme.  And because Facebook is not interoperable with other social networks, its users face high costs to switch to other networks, locking them into Facebook's network.

98.     Facebook's awareness of these features of the Social Network and Social Media Markets shaped its competitive strategy.  For example, a senior executive at the company described its acquisition strategy as a "land grab," while Zuckerberg has boasted that Facebook "can likely always just buy any competitive startups."[68]  Documents show that Facebook saw Instagram and WhatsApp as maverick competitors and their acquisitions as a way to protect and strengthen the durability of Facebook's monopoly.[69]

99.     Upstart social media applications not only presented a competitive threat to Facebook in the Social Media Market, they also constituted potential entrants into the Social Network Market.  Indeed, social media applications like Instagram and WhatsApp initially lacked the user base necessary to compete as a social network.  They therefore focused on a relatively narrow niche in the Social Media Market in order to gain a foothold.  As Instagram and WhatsApp added users and features, however, they began to build a combination of user base and functionality

---

[65] *Id.*

[66] *Id.* at 143.

[67] *Id*. at 384.

[68] *Id*. at 12–13.

[69] *See id*. at 149, 160.

that could help them enter the Social Network Market and compete with Facebook in that market as well.

100.   Facebook's anticompetitive conduct, described more fully below, combined with strong network effects and high barriers to entry, enabled it to obtain and maintain its monopolies over the Social Network and Social Media Markets in the United States.  As recognized by the House Antitrust Subcommittee: "Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressures from new entrants or existing firms."[70]

## D.   Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring Market Power) by Deceiving Consumers about Its Privacy Practices.

101.   For years, Facebook has engaged in a pattern of deception about the amount of data it obtains and the extent of the data harvesting and use by third parties its applications have long enabled.  Its deception has only recently begun to come to light.

102.   Privacy practices were a crucial form of competition in the early days of the Social Network and Social Media Markets.  After its founding in 2003, Myspace quickly dominated the Social Network and Social Media Markets.  By 2006, Myspace supplanted Google as the most visited website in the United States.

103.   Myspace offered an "open" social network, allowing *all* interested users to join Myspace.  Moreover, Myspace users could sign up for Myspace using unverified usernames and pseuodnyms.

104.   By 2007, overwhelmingly negative headlines began drawing attention to Myspace's lax privacy practices.  In particular, users, parents, and critics alike attributed sexual assaults, suicides, and murders to Myspace, speculating that Myspace's open network—which cloaked wrong-doers with relative anonymity, an added-level of covert protection—triggered these events.

105.   By this time, competitors to Myspace—including Friendster, Orkut, Flip.com, Bebo, and Facebook—had begun to emerge.

106.   Given Myspace's prominence, Facebook sought to differentiate itself from Myspace in order to entice users to join Facebook.  Facebook initially distinguished itself on the basis of its

---

[70] *Id.* at 13.

strict privacy settings, including its closed-network approach. Importantly, Facebook promised users that it would disclose its "information and privacy practices" and that it would "not use cookies to collect private information from any user."[71]

107. In 2006, some 250 million people around the world used a social network: 100 million used Myspace, 12 million used Facebook, and the remainder used a number of other competitors.[72] In 2007, user growth at Myspace began to come to a halt—by mid-2007, Facebook had begun to supplant Myspace as the most visited social network in the United States.[73]

108. Facebook's representations to consumers regarding its data policies were instrumental to Facebook gaining and maintaining market share at the expense of its rivals, including Myspace. A 2004 consumer survey revealed that a majority of Americans indicated that privacy was a "really important issue that [they] care about often."[74] Another study focused on early Facebook users' attitudes towards privacy, finding that they cared more about privacy policy than about terrorism.[75] Individuals in academia compared Facebook users' satisfaction with Facebook's privacy settings to Myspace users' satisfaction with Myspace's privacy settings, concluding that users typically preferred Facebook's settings over Myspace's.[76]

109. Facebook itself recognized the importance that its supposed stringent privacy protections had in allowing Facebook to quickly amass dominance. In its 2008 internal report entitled "Facebook Secret Sauce," Facebook recognized the nexus between its early success and its representations regarding privacy, explaining that "[u]sers will share more information if given

---

[71] Srinivasan, *supra*, at 39. Cookies refer to small text files that websites can install on users' computers, enabling them to remember and record users' information. *Id.* at 49.

[72] *Id.* at 54.

[73] *Id.*

[74] *Id.* at 52 (brackets in original) (internal citation omitted).

[75] *Id.* (internal citation omitted).

[76] *Id.*

more control over who they are sharing with and how they share."[77]  Similarly, in a November 2011 post on Facebook, Zuckerberg recalled:

> When I built the first version of Facebook, almost nobody I knew wanted a public page on the internet.  That seemed scary.  But as long as they could make their page private, they felt safe sharing with their friends online.  Control was key.  With Facebook, for the first time, people had the tools they needed to do this.  *That's how Facebook became the world's biggest community online.*[78]

110.    To this day, consumers continue to care deeply about privacy.  That is why many companies market their commitment to privacy as a selling point for their products and services.  Apple, for instance, tells the public that "Apple believes that privacy is a fundamental human right" and that "[w]e share your belief that customers should have control over their data."[79]

111.    Despite Facebook's representations about its superior data privacy practices, Facebook spent the next fifteen years deceiving consumers about the data privacy protections that it provided to users in exchange for access to their data.  When the scope of commercial surveillance—and the harvesting and use of user data—that Facebook's practices enabled first began to be revealed in 2018 following news coverage about the Cambridge Analytica scandal, Facebook had already achieved monopolies in the Social Network and Social Media Markets.

112.    Publicly, Facebook sought to differentiate itself by offering superior privacy protections.  But behind the scenes—and entrenched in markets which provided additional protections to Facebook's monopoly in the forms of powerful network effects, high switching costs, and other significant entry barriers—Facebook created a commercial surveillance infrastructure that enabled it to dominate its competitors.  This would not have been possible if Facebook had not deceived consumers about its data privacy and commercial surveillance practices.

---

[77] *State of New York et al v. Facebook, Inc.*, Case No. 1:20-cv-03589-JEB (D.D.C.), Dkt. 70, ¶ 76.

[78] Anita Balakrishnan, Matt Hunter, & Sara Salinas, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC News (Apr. 9, 2018), available at https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html (last accessed Apr. 15, 2021) (emphasis added).

[79] Apple Privacy Letter, *supra*.

113.   In 2006, Facebook introduced News Feed.  The curated feed was intended as a central destination so users did not have to browse through friends' profiles for updates.  About one million users joined a "Facebook News Feed protest group," arguing the feature was too intrusive.[80]

114.   Facebook initially brushed off the criticism, but after continued outcry, Mark Zuckerberg issued a public apology, representing that "[w]hen I made Facebook two years ago . . . I wanted to create an environment where people could share whatever information they wanted, but also have control over whom they shared that information with" and urging that Facebook had "built extensive privacy settings – to give you even more control over who you share your information with."[81]  Importantly, Zuckerberg reassured Facebook users: "[t]his was a big mistake on our part, and I'm sorry for it.  But apologizing isn't enough.  I wanted to make sure we did something about it, and quickly.  So we have been coding nonstop for two days to get you better privacy controls."[82]

115.   Facebook then instituted what it claimed were enhanced privacy settings that purportedly allowed users greater ability to keep their activities private.[83]  For example, Facebook maintained that it would give users the option to block certain information—such as when a user removes profile information, posts on a Facebook Wall, comments on a photo, adds a friend, removes a relationship status, or leaves a group—from appearing on other users' News Feeds.[84]  In announcing these updates, Facebook publicly assured users that "industry-leading privacy restrictions . . . have made Facebook a trusted site for sharing information."[85]

---

[80] Alyssa Newcomb, *Can You Even Remember How You Coped Before Facebook's News Feed?*, NBC News, Sept. 26, 2016, available at https://kl.link/2G1XF6Q (last accessed Apr. 15, 2021).

[81] Mark Zuckerberg, *An Open Letter from Mark Zuckerberg*, Facebook (Sept. 8, 2006), available at https://www.facebook.com/notes/facebook/an-open-letter-from-mark-zuckerberg/2208562130/ (last accessed Apr. 18, 2021).

[82] *Id.*

[83] *See* Facebook, *Facebook Launches Additional Privacy Controls for News Feed and Mini-Feed* (Sept. 8, 2006), available at https://kl.link/3oq7BrY (last accessed Apr. 15, 2021).

[84] *Id.*

[85] *Id.*

116.    Despite claiming to provide users with enhanced privacy protections, however, Facebook increasingly made user data available to advertisers without disclosure to users. Facebook's unrelenting deception of its users allowed Facebook to continue to amass market share in the Social Network and Social Media Markets.

117.    Beginning in 2007, Facebook gave app developers access to user content and information, including content marked private.[86]  As Facebook attempted "to become the world's dominant social media service, it struck agreements allowing phone and other device makers access to vast amounts of its users' personal information."[87]

118.    Facebook did not disclose to its users the scope of the content and data that Facebook began providing to third parties at that early date, including user data marked "private."  But Facebook explained to third-party app developers in May 2007 that Facebook's core value proposition and business model was "providing access to a new kind of data—social data, which enables you to build applications that are relevant to users."  With respect to that data, Facebook told developers:  "You are on a level playing field with us.  You can build robust apps, not just widgets.  Complete integration into the Facebook site."

119.    Also in 2007, under the guise of "social advertisement," Facebook introduced its "Beacon" product.  Beacon allowed participating third parties to track users' purchases outside Facebook and notify their Facebook friends.[88]  As an illustration, when a Facebook user rented a movie from Blockbuster, the user would immediately receive a "pop-up" notification from Blockbuster requesting permission to share details regarding the user's movie rental with Facebook.[89]  Unless the user expressly declined permission by selecting the "No, Thanks" option, Facebook would receive information about the user's rental activity (such as the movie title rented)

---

[86] DCMS Report, *supra*, at ¶ 103.

[87] Gabriel J.X. Dance, Nicholas Confessore, and Michael LaForgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, The New York Times (June 3, 2018), available at https://kl.link/2HwXIYP (last accessed Apr. 15, 2021).

[88] Louise Story, *Facebook Is Marketing Your Brand Preferences (With Your Permission)*, The New York Times (Nov. 7, 2007), available at https://kl.link/34tuzXy (last accessed Apr. 15, 2021).

[89] Srinivasan, *supra*, at 56.

and publish that information on the user's Facebook page.[90]   An example of a Beacon pop-up request displayed to Facebook users on third-party sites is pictured below:[91]



120.    Many of Facebook's representations regarding its Beacon program were subsequently proven to be untrue.  Facebook initially maintained that Beacon only tracked and maintained the activity of users that consented when prompted by the pop-up seeking permission.[92] In reality, however, Beacon allowed Facebook to track the activity of even those users that clicked the "No, Thanks" prompt.[93]

121.    The FTC expressed concern about Facebook's Beacon program, and public outrage and litigation ensued.[94]  Zuckerberg ultimately apologized, let users opt out, and called Beacon a mistake, reassuring Facebook users: "I'm not proud of the way we've handled this situation and I know we can do better."[95]  Zuckerberg's statement represented that Facebook had learned its lesson and that it would not, in fact, use their data in unauthorized or intrusive ways.

122.    As of the third quarter of 2008, Facebook had around 100 million monthly active users worldwide.[96]  This placed it just behind Myspace, which had more than 110 million monthly

---

[90] *Id.*

[91] *Id.*

[92] *Id.* at 57.

[93] *Id.* at 58.

[94] *See id.* at 57–59.

[95] Betsy Schiffman, *Facebook CEO Apologizes, Lets Users Turn Off Beacon*, Wired (Dec. 5, 2007), available at https://www.wired.com/2007/12/facebook-ceo-apologizes-lets-users-turn-off-beacon/ (last accessed Apr. 20, 2021).

[96] *Number of monthly active Facebook users worldwide as of 4th quarter 2020*, Statista, available at https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last accessed Apr. 15, 2021).

active users.[97]  Facebook passed Myspace in terms of monthly active users in the United States in 2009.  Myspace never came close to Facebook again, although it continued to exist as a competitor through 2014.

123.    In or around November 2009, Facebook began providing its users with a "Central Privacy Page," which contained a "Profile" link and accompanying text representing that a user could "[c]ontrol who can see your profile and personal information."[98]  An example of Facebook's "Central Privacy Page" is pictured below:



124.    By 2010, bolstered by its ostensible commitment to privacy, Facebook had become the largest social network in the world.  However, unknown to nearly all of its users, Facebook had transitioned its business to selling access to data, which it did by selling access to developers and selling advertisements targeting Facebook's network of engaged and active users.  In March 2010, it was reported that Facebook had booked revenues of up to $700 million in 2009 and was on track for $1.1 billion in 2010—almost all from advertising to its users.  Facebook had been roughly doubling its revenues every year up until that point—$150 million in 2007; nearly $300 million in 2008; and $700 million in 2009.

125.    In early 2010, Facebook launched its "Like" button, which is also referred to as a "Social Plugin."  The "Like" button is a web plug-in that appears on a third party's website.  If a user supports or "likes" a particular piece of content on a third party's website—such as a particular news article—a number ticker besides the "Like" button increases by one.  A preview of the content

---

[97] Jeremiah Owyang, *Social Network Stats: Facebook, MySpace, Reunion (Jan, 2008)*, https://web-strategist.com/blog/2008/01/09/social-network-stats-facebook-myspace-reunion-jan-2008/ (last accessed Apr. 15, 2021).

[98] DCMS Report, *supra*, ¶ 65.

CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

that the Facebook user "liked" on a third party's website may appear to the user's followers on Facebook in the user's News Feed, potentially drawing additional viewers to visit the third-party website after observing the previewed content in the user's News Feed. A version of Facebook's "Like" button that appears on third-party websites is pictured below:[99]



126. Marketed as a way to share opinions, the Like button in reality enabled Facebook to obtain consumer data by tracking activity across the internet. At the time that Facebook launched its "Like" button, Facebook's "Frequently Asked Questions" page indicated that "No data is shared about you when you see a social plug-in on an external website."[100] Independent researchers subsequently determined, however, that the presence of the "Like" button on third-party websites allowed Facebook to monitor users and obtain their data anytime users visited those third-party websites, even when users did *not* click the "Like" button.[101]

127. Investigators soon uncovered this deception, and Facebook settled with the FTC to resolve the agency's charges that "Facebook deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[102] Facebook's settlement with the FTC barred Facebook from making any further deceptive privacy claims, required Facebook to get consumers' approval before it changes the way it shared their data, and required Facebook to obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years.

128. In particular, under the settlement, Facebook was specifically:

[99] Ray C. He, *Introducing new Like and Share buttons*, Facebook for Developers News (Nov. 6, 2013), available at https://developers.facebook.com/blog/post/2013/11/06/introducing-new-like-and-share-buttons/ (last accessed Apr. 15, 2021).

[100] Declan McCullagh, *Facebook 'Like' button draws privacy scrutiny*, CNET (June 2, 2010), available at https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ (last accessed Apr. 15, 2021).

[101] Srinivasan, *supra*, at 65–67.

[102] Press Release, Federal Trade Commission, Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises (Nov. 29, 2011), available at https://kl.link/3mqWAEX (last accessed Apr. 15, 2021).

a)      barred from making misrepresentations about the privacy or security of consumers' personal information;

b)      required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

c)      required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

d)      required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

e)      required, within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.[103]

129.    Ultimately, however, Facebook did not comply with its promises to the FTC.

130.    In response to these controversies, and as another example of the promises that Facebook made—but subsequently did not keep—regarding its privacy protections, Facebook announced in 2012 that future privacy changes would require user approval through voting.[104] During a "privacy press conference," Facebook founder Mark Zuckerberg explained that Facebook is "one of the only services on the web where people are sharing pretty personal and intimate information"; that requiring users' approval for privacy changes "mak[es] it so that we can't just put in a new terms of service without everyone's permission"; and that "[w]e think these changes will increase the bonding and trust users place in the service."[105]  But, consistent with its pattern of

_____

[103] *Id.*

[104] Eyder Peralta, *Facebook Will Allow Users to Vote On Privacy Changes*, NPR (June 1, 2012), available at https://www.npr.org/sections/thetwo-way/2012/06/01/154162976/facebook-will-allow-users-to-vote-on-privacy-changes (last accessed Apr. 15, 2021).

[105] Srinivasan, *supra*, at 61–62.

deception, Facebook ultimately did not keep that commitment, choosing to end the process of requiring users' approval for future privacy changes.[106]

131.    Facebook's continued promises regarding privacy negatively impacted potential rivals—even those backed by the largest companies in the world—from ever gaining appreciable market share.  In 2010, Google launched a new social network, Google+.  Google+ was Google's attempt to build out a "social graph" that would leverage a common user identity across Google products, including YouTube and Gmail.

132.    With Google+, Google sought to surpass the essential product features and functionality of Facebook.  The planned features for Google+ included a continuous scroll product called the "stream"; a companion feature called "sparks," which related the "stream" to users' individual interests; and a sharing app called "Circles" to share information with one's friends, family, contacts, and the public at large.

133.    Google+ represented a massive investment of resources to bring a finished, full-scale social network to market.  Google conscripted almost all of the company's products to help build Google+.  At its peak, Google+ involved 1,000 employees from divisions across the country.  Google even required employees to use the Google+ Hangouts video chat feature, which was supposed to help drive adoption in the tech industry and beyond.

134.    Facebook knew that many users would switch to Google+ if they thought Facebook offered inferior privacy protections.  The competitive threat of Google+ (while it lasted) therefore temporarily prevented Facebook from even further eroding its privacy features.  In 2011, for example, Facebook allowed its users to "untag" themselves from photographs, even where another user had "tagged" them in the first place.[107]  Facebook had planned to eliminate this feature which allowed users to "untag" themselves, but feared that this change would welcome controversy since Facebook's planned change would reduce its users' privacy.  Indeed, one Facebook executive

---

[106] Dave Lee, *Facebook criticised over decision to stop public privacy votes*, BBC News (Nov. 22, 2012), available at https://www.bbc.com/news/technology-20444678 (last accessed Apr. 15, 2021).

[107] *State of New York et al v. Facebook, Inc*., Case No. 1:20-cv-03589-JEB (D.D.C.), Dkt. 70, ¶ 95.

1   explained: "IF ever there was a time to AVOID controversy, it would be when the world is

2   comparing our offerings to G+."[108]  The same executive subsequently advised that Facebook

3   postpone any changes to its privacy policies "until the direct competitive comparisons begin to die

4   down."[109]

5          135.    Google's attempt to compete with Facebook, ultimately failed, however.  Even

6   though Google+ continued as a competitor until 2018, it was never able to dethrone Facebook or

7   take appreciable market share away from Facebook, all the while Facebook continued to mislead

8   users in order to prevent them from switching to a network that offered similar features, but with

9   better actual privacy practices.

10         136.    Facebook's deception about its data privacy practices and anticompetitive string of

11  acquisitions drove the rapid growth of Facebook's ever-increasing user base and increased the value

12  of Facebook's social graph.  As Facebook's VP of Product Management explained to Mark

13  Zuckerberg in an October 2012 email, the data that Facebook collects has made Facebook

14  progressively better at collecting and monetizing consumer data:  "We know more about what

15  people want to see because people look at more stuff on our platform . . .  the more people that use

16  the system, the more information we have on how to make more people use the system."

17         137.    Facebook went public in 2012.  In pursuit of revenue, Facebook began using "View

18  Tags," which allow advertisers to track Facebook users across the Internet using cookies.[110]

19  Facebook also gave advertisers the ability to conduct more fine-grained bidding for advertising and

20  to advertise specifically to a "custom audience"—*i.e.*, a list of specific users provided by the

21  advertiser.  Facebook did not disclose that its user data practices allowed third parties to track

22  Facebook users across the internet using cookies.

23

24

25

---

26  [108] *Id.*

    [109] *Id.*

27
    [110] Rebecca Greenfield, *2012: The Year Facebook Finally Tried to Make Some Money*, The
28  Atlantic (Dec. 14, 2012), available at https://kl.link/34qhxdd (last accessed Apr. 15, 2021).

138.    At the time of Facebook's 2012 initial public offering ("IPO"), its filings with the Securities and Exchange Commission ("SEC") indicated that the company had 845 million monthly active users and that its website featured 2.7 billion daily likes and comments.[111]

139.    Facebook later combined user content with other third-party data, thereby de-anonymizing the third-party data.  For example, in April 2013, Facebook created information dossiers on millions of users and non-users alike.  The dossiers even included names, health information, information about neighbors, and proclivities.  Facebook did not disclose the dossiers to users (or even the fact of the dossiers' existence), using them instead to allow advertisers to target users with more precision.[112]   Users were unaware of the extent of Facebook's commercial surveillance and did not first begin to become aware until the news of the Cambridge Analytica scandal broke—in March 2018, the overwhelming majority of Facebook users incorrectly believed Facebook collected data only when logged in.[113]

140.    Facebook engaged in this continued pattern of deception with the specific intent to monopolize the Social Network and Social Media Markets and ultimately to maintain and exploit its monopoly.  Facebook succeeded in deceiving consumers long enough to solidify its market power in the Social Network and Social Media Markets.  By the time Facebook's deception about its subpar data privacy practices was revealed in 2018—*i.e.*, the year Google+ left the market due to inability to grow—it had achieved unrivaled dominance.

**E.    The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception.**

141.    It was not until the Cambridge Analytica scandal in 2018, that consumers first began to discover the scope and implications of Facebook's lax data privacy practices.  In particular, the scandal revealed that Facebook had been giving app developers the ability to harvest Facebook

---

[111] Facebook's Form S-1 Registration Statement under the Securities Act of 1933, https://kl.link/2L9TgRD (last accessed Apr. 15, 2021).

[112] Tim Peterson, *Facebook Will Remove Advertisers' Other Third-Party Data Option, But Loopholes, Questions Remain*, DigiDay (Apr. 6, 2018), available at https://kl.link/37Mprjj (last accessed Apr. 15, 2021).

[113] Paul Hitlin & Lee Rainie, *Facebook Algorithms and Personal Data*, Pew Research Center (Jan. 16, 2019), available at https://kl.link/37EsidN (last accessed Apr. 15, 2021).

1  users' private data without the users' consent, and to use that data for purposes beyond targeted

2  advertising on Facebook.

3       142.   Cambridge Analytica ("CA") was a British political consulting firm that combined

4  data harvesting and analytics for use in political advertising.  A CA app known as "This Is Your

5  Digital Life" presented users with a series of questions that were used to build a psychological

6  profile on users.  The app harvested data not only from the app users' own apps, but also from the

7  users' Facebook friends.

8       143.   CA's practices were uncovered in March 2018, when it was revealed that, based on

9  the 270,000 Facebook users who used the CA app, CA was able to access the personal data of up

10  to 87 *million* Facebook users.  The vast majority of these users had not given CA permission to

11  access their data.

12      144.   After the scandal broke, Facebook banned the app and claimed that CA had breached

13  Facebook's terms of service.[114]  However, an investigation revealed that, as early as April 2015,

14  Facebook recognized that it was unable to keep track of how many app developers were using

15  previously downloaded data.[115]  And Facebook's data permissions allowed apps to access data not

16  only about an app user, but about all of the app user's friends.

17      145.   As early as at least 2010, Facebook deceptively allowed third parties to access the

18  data of a Facebook user's friends, and this policy formed part of the basis for the FTC's 2011

19  complaint.   In 2012, however, as part of its settlement with Facebook, the FTC ordered that

20  Facebook "shall not misrepresent in any matter, expressly or by implication, the extent to which

21  [Facebook] maintains the privacy or security of Covered Information, including . . . [Facebook's

22  collection, use, or disclosure of any Covered Information[.]"  In 2015, Facebook further represented

23  to users that it was ending the practice of allowing third parties to access the data of users' friends.

24

25      [114] Kurt Wagner, *Here's how Facebook allowed Cambridge Analytica to get data for 50
       million users*, Vox (Mar. 17, 2018), available at https://kl.link/2ToOFLZ (last accessed Apr. 15,

26      2021).

27      [115] Deepa Seetharaman and Kirsten Grind, *Facebook's Lax Data Policies Led to Cambridge
       Analytica Crisis*, The Wall Street Journal (Mar. 20, 2018), available at https://kl.link/3jt8o86 (last

28      accessed Apr. 15, 2021).

Contrary to Facebook's representation, however, and in breach of its 2012 settlement with the FTC, most third parties could continue to access this data. The volume of data these third parties acquired from Facebook led one Facebook employee to remark: "I must admit, I was surprised to find out that we are giving out a lot here for no obvious reason."[116]

146.    Until at least 2018, Facebook still allowed some number of third parties to access the data of users' friends. The DOJ expressly noted Facebook's falsehoods regarding its sharing its users' data in its 2019 complaint against Facebook for Facebook's breach of its 2012 settlement agreement with the FTC.[117] It was only after news of the Cambridge Analytica scandal broke that Facebook's continued deception regarding its sharing of the data of its users' friends began to come to light. In its 2019 complaint against Facebook, the DOJ cautioned that "[t]he full scale of unauthorized collection, use, and disclosure of consumer information resulting from Facebook's conduct is unknown due, at least in part, to the company's lack of recordkeeping."[118]

147.    By this time in 2018, however, Facebook's social network and social media monopolies were fully entrenched with over 217 million users in the United States. That year, Facebook earned over $55 billion in revenue, almost completely from selling targeted advertising made more valuable to Facebook and third parties due to a lack of meaningful data privacy protections.

148.    In September of 2019, Facebook said it suspended tens of thousands of apps for improperly taking users' personal data and other transgressions, "a tacit admission that the scale of its data privacy issues was far larger than it had previously acknowledged."[119] Facebook eventually disclosed that it had suspended 69,000 apps, and 10,000 of those apps were flagged for potentially

---

[116] *United States v. Facebook, Inc.*, Case No. 1:19-cv-02184 (D.D.C.), Dkt. 1, ¶ 84.

[117] *Id.*, ¶¶ 5–9.

[118] *Id.*, ¶ 126.

[119] Kate Kogner, Gabriel J.X. Dance, and Mike Isaac, *Facebook's Suspension of 'Tens of Thousands' of Apps Reveals Wider Privacy Issues*, The New York Times (Sept. 20, 2019), available at https://kl.link/31JmImH (last accessed Apr. 15, 2021).

misappropriating personal data from Facebook users.[120] The scale and scope of Facebook's data privacy issues made clear that its lackluster data privacy protections were a feature, not a bug, of Facebook's social network.

149.    On July 24, 2019, the FTC and the DOJ announced that Facebook would pay a $5 billion penalty, and submit to new restrictions and a modified corporate structure, to settle charges that the company had "deceiv[ed] users about their ability to control the privacy of their personal information."[121]

150.    The largest penalty ever imposed by the FTC before that time was $275 million. The FTC explained: "Facebook monetizes user information through targeted advertising, which generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share information on its platform, Facebook promises users they can control the privacy of their information through Facebook's privacy settings."[122]

151.    The FTC further explained that despite Facebook's representations, "Facebook repeatedly used deceptive disclosures and settings to undermine users' privacy preferences," determining that "[t]hese tactics allowed the company to share users' personal information with third-party apps that were downloaded by the user's Facebook "'friends,'" and further finding that "Facebook took inadequate steps to deal with apps that it knew were violating its platform policies."[123]

152.    The FTC's 2019 charges made clear that Facebook had egregiously violated the FTC's 2012 order by repeatedly using deceptive disclosures and settings to undermine users' privacy preferences. In testimony to the United Kingdom's House of Commons, the FTC's former Chief Technologist—Ashkan Soltani—recognized that "time and time again Facebook allows

---

[120] *See* Facebook, *An Update on Our App Developer Investigation* (Sept. 20, 2019), available at https://kl.link/31FSVeP (last accessed Apr. 15, 2021).

[121] Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, available at https://kl.link/34snVR0 (last accessed Apr. 15, 2021).

[122] *Id.*

[123] *Id.*

1    developers to access personal information of users and their friends, in contrast to their privacy

2    settings and their policy statements."[124]

3          153.    In the aftermath of its 2012 settlement with the FTC, Facebook promised that it

4    would give consumers "clear and prominent" notice and obtain their consent before sharing their

5    information beyond those entities clearly enumerated in consumers' privacy settings.[125]    If a

6    Facebook user, for example, curated his or her privacy settings to designate that particular

7    content—such as photos—be visible only to the user's "friends," Facebook represented—and the

8    2012 FTC settlement required—that Facebook would obtain the user's "affirmative express

9    consent" before sharing that content beyond the user's "friends."[126]

10          154.    Consumers relied on Facebook's representations before and after the aftermath of

11   its 2012 settlement with the FTC in deciding to continue to use Facebook (rather than its

12   competitors) and to give Facebook access to their personal data in exchange for use of Facebook.

13   But by the time consumers learned that Facebook had violated that settlement, they could not

14   reasonably switch to a comparable social network or social media application.  Facebook had

15   already achieved monopoly power in the Social Network and Social Media Markets, and network

16   effects, high barriers to entry, and immense switching costs made it more likely that Facebook's

17   monopolies would be maintained.  Although market forces can sometimes reign in companies that

18   deceive users, the Social Network and Social Media Markets' unique features made it more difficult

19   for the market to discipline Facebook for violating its commitments to consumers.

20          155.    Notwithstanding widespread outrage after the Cambridge Analytica scandal, the

21   vast majority of Facebook users have continued to use Facebook and its family of products.  The

22   reason for this is clear.  As Facebook was keenly aware, a social network really only has value if

23

24          [124] DCMS Report, *supra*, ¶ 89.

25          [125] Frederic Lardinois, *Facebook And FTC Settle Privacy Charges—No Fine, But 20 Years
     Of Privacy Audits*, TechCrunch (Aug. 10, 2012), available at https://techcrunch.com/2012/08/10/
26   facebook-ftc-settlement-12/ (last accessed Apr. 1, 2021).

27          [126] Somini Sengupta, *F.T.C. Settles Privacy Issue at Facebook*, The New York Times (Nov.
     29, 2011), available at https://www.nytimes.com/2011/11/30/technology/facebook-agrees-to-ftc-
28   settlement-on-privacy.html (last accessed Apr. 1, 2021).

users' friends use it too. And once a social network reaches critical mass, it entrenches itself in the the market, and users generally no longer have a viable alternative to the social graph, "as there is no reason for users to start using a social network if there is no one there with whom they can connect."[127] Thus, notwithstanding widespread outrage after the Cambridge Analytica scandal, few Facebook users stopped using Facebook, because there was no longer any other viable network to use.

**F.    Facebook Uses Anticompetitive Acquisitions and Threats to Destroy Competition in the Social Network and Social Media Markets.**

156.    Facebook also sought to protect and expand its monopolies by regularly destroying and acquiring competitive threats, and it used its market power and data advantage to anticompetitively achieve its monopolistic objectives.

157.    Since its founding in 2004, Facebook has acquired at least 63 companies.[128] While those acquisitions have been public, the public has only recently discovered the extent to which Facebook used the data it deceptively obtained from users to identify nascent competitors and target them for acquisition or destruction. This new information has shown that Facebook's anticompetitive acquisitions were enabled by, and the result of, Facebook's deceptive privacy practices.

**1)    Facebook's Tracking of Consumers Drove Its Copy, Acquire, or Kill Strategy.**

158.    Facebook used data that it obtained from users to track the websites and apps visited by its users—often without full disclosure—to identify which upstart competitors were gaining traction so that it could target them for acquisition or destruction. Facebook "led a sustained effort to surveil smaller competitors to benefit Facebook . . . steps taken to abuse data, to harm competitors, and to shield Facebook from competition."[129] In fact, Facebook intentionally developed its ability to surveil users to aid its acquisition strategy, which has continued from the point at which it first emerged as the largest social network through today.

---

[127] House Report, *supra*, at 89.

[128] *Id.* at 149.

[129] *Id.* at 166.

159.   Historically, Facebook used its own internal data and data from Comscore, a data analytics and measurement firm, to track the growth of competitive threats.[130]  But Facebook's efforts were only as good as that underlying data.  Facebook therefore decided to capture more robust data from its users through increased surveillance so that it could remove future competitors from the social network and social media chessboards.

160.   In April 2012, Facebook's Director of Growth, Javier Olivan, emailed Zuckerberg and Chris Cox, Facebook's Chief Product Officer, about improving Facebook's "competitive research."  Olivan indicated that "getting our data in great shape is going to require effort," but that Facebook's building its own system for identifying competitive threats would "allow us to get 10x better at understanding" competitive threats to Facebook's dominance of mobile devices.[131]  Olivan explained:

> I keep seeing the same suspects (instagram, pinterest, ...) [sic] both on our competitive radar / platform strategy as wins . . . I think having the exact data about their users [sic] engagement, value they derive from [Facebook] . . . would help us make more bold decisions on whether they are friends or foes. Back to your thread about "copying" vs. "innovating" we could also use this info to inspire our next moves.[132]

161.   Zuckerberg responded "Yeah, let's do it."   Underscoring the importance to Facebook of utilizing its users' data to identify competitive threats, Zuckerberg committed to "find[ing] some time periodically during my weekly reviews to go over this stuff."[133]

162.   In 2013, Olivan approached Zuckerberg about the prospect of Facebook acquiring Onavo, an Israeli mobile web analytics company that ran a virtual private network ("VPN").  A VPN provides security and encryption to a user, creating a "data tunnel" which cloaks data when

---

[130] *Id.* at 160–66.

[131] *Id.* at 161.

[132] *Id.*

[133] *Id.*

sent over the user's internet connection, scrambling the user's online activity from detection by third parties.[134]

163.    At that time, Olivan urged Zuckerberg that Onavo could provide Facebook powerful "competitive insights" that were "really cool for identifying acquisition targets."[135]  According to Olivan, "Onavo makes sense strategically since it solves the mobile market data problem 10x better than any other alternative – and you know how important this data becomes any time we have engagement or competition questions[.]"[136]

164.    Facebook acquired Onavo in October 2013 for $115 million.  Prior to acquiring Onavo, Facebook had relied on Onavo's surveillance of Facebook's competitors for years, such as during the process of acquiring Instagram, and Facebook ultimately acquired and used Onavo's assets to track potential competitors through non-public, internal, real-time data about its users' engagement, usage, and time spent on other apps.[137]  Tellingly, at the time it acquired Onavo, Facebook did *not* intend to place Onavo's employees in Facebook's Data Analytics team.  Instead, in acquiring Onavo, Facebook planned to place Onavo's employees, including its cofounder, Guy Rosen, under Facebook's Growth team, reporting to Javier Olivan.[138]

165.    Onavo allowed Facebook to surreptitiously gather information from consumers who used Onavo's mobile applications by representing that these applications provided data security features.  The types of information that Facebook collected through Onavo include (among others) "every app the user has accessed"; "the number of seconds the user spent in the app per day"; "the percent of time the user spent in a specific app out of their total mobile usage time"; "the actions taken by the user in each app"; and personal information such as the user's country of origin, age,

---

[134] Steve Symanovich, *What is a VPN?*, NortonLifeLock (Jan. 14, 2021), available at https://us.norton.com/internetsecurity-privacy-what-is-a-vpn.html (last accessed Apr. 19, 2021).

[135] *See State of New York et al v. Facebook, Inc*., Case No 1:20-cv-03589-JEB (D.D.C.), Dkt. 70, ¶ 141.

[136] *Id.*

[137] Betsy Morris and Deepa Seetharaman, *The New Copycats: How Facebook Squashes Competition From Startups*, The Wall Street Journal (Aug. 9, 2017), available at https://kl.link/3e6nMpW (last accessed Apr. 15, 2021).

[138] House Report, *supra*, at 161.

and gender.[139]  Facebook weaponized the near-instantaneous information it obtained through Onavo to identify competitors to "copy, acquire, or kill."

166.    Facebook immediately began integrating Onavo's applications into both its business operations and its acquisition strategy.  Facebook, for example, began analyzing data secretly collected from Onavo's Protect software, which was a massive surveillance and data collection scheme disguised as VPN software.  Cynically marketed  to consumers as a way to, *inter alia*, "keep you and your data safe," "Save, Measure & Protect your mobile data," "help[] you take charge of how you use mobile data and protect your personal info," "[a]dd an extra layer of protection to all your mobile data traffic for additional security," and provide "Peace of Mind When You Browse," Onavo Protect in fact monitored all web and mobile application traffic on a user's mobile device and ultimately redirected that information to Facebook, where it was logged and analyzed by Facebook's product teams.[140]  By February 2018, Onavo apps had been downloaded thirty-three million times across both iOS and Android.

167.    Facebook has used extensive surveillance of users to identify and target nascent competitive threats.  Using the data it obtained from Onavo and other sources, Facebook then eliminated upstart competitors by demanding concessions in agreements, by denying access to vital sources of data and information on Facebook's network, or by acquisition.  As elected officials have recognized, the technology Facebook obtained from Onavo and other data brokers allowed Facebook to protect and further its market dominance:[141]



**Congresswoman Pramila Jayapal** ✓
July 29, 2020 · 🌐

Facebook is a case study in monopoly power: It harvests and monetizes our data, then uses it to spy on competitors—to copy, acquire, and kill rivals.

This destructive model makes it impossible for new companies to flourish—harming our democracy, small businesses, and consumers.

---

[139] *Australian Competition & Consumer Commission v. Facebook, Inc. et al*, Federal Court of Australia (Dec. 16, 2020), ¶ 11, available at https://www.accc.gov.au/system/files/ACCC%20v%20Facebook%20Inc%20%26%20Ors_%20Concise%20Statement_0.pdf (last accessed Mar. 29, 2021) ("ACCC Complaint").

[140] *Id.*, at Annexure A1–A4.

[141] United States Representative Pramila Jayapal, Facebook (July 29, 2020), available at https://www.facebook.com/RepJayapal/videos/questioning-mark-zuckerberg/319712279065223/ (last accessed Apr. 19, 2021).

168.    Some of the ways that Facebook exploited users' data that Facebook obtained from Onavo or other sources to inform Facebook's anticompetitive "copy, acquire, kill" strategy are detailed below.  Like a football team that stole other teams' play calls, Facebook used its deceptive surveillance of users to know precisely which competitors to pick off.  Notably, however, the extent to which Facebook used ill-gotten user data to pursue these strategies was not known until recently.

### 2)    Facebook Threatened Competitors with Discriminatory Practices to Help Drive its Anticompetitive Acquisition Strategy.

169.    In addition to the surveillance Facebook conducted through Onavo, Facebook's "copy, acquire, kill" strategy was also built on the company's willingness to use deceptively-obtained user data to target key competitors by discriminatorily denying them access to the "Facebook Platform."

170.    The "Facebook Platform" allows third parties to develop products which work in conjunction with Facebook.  Zuckerberg has described the "Facebook Platform's" purpose as "mak[ing] Facebook into something of an operating system so you can run full applications[.]"[142] In order to access this "operating system," developers and third parties must send data to, and receive data from, Facebook using its application programming interfaces ("APIs").

171.    In making its dominant "Platform" available to third parties, Facebook recognized that such access would be profitable to Facebook.  Facebook, however, has selectively foregone those benefits and used discriminatory access to its social graph and pretextually enforced its "Platform" policies to prevent possible competitors from emerging, continuing to harm consumers at every turn.  As Zuckerberg said regarding identified competitive threats: "I think the right solution here is to just be a lot stricter about enforcing our policies and identifying companies as competitors."[143]

172.    Facebook did exactly that, using supposed violations of its policies as a pretext to cut off social apps that had become too popular, like Vine, Stackla, Ark, and MessageMe.  Facebook

---

[142] David Kirkpatrick, *Facebook's plan to hook up the world*, CNN Money (May 29, 2007), available at https://kl.link/3qrmFGT (last accessed Apr. 15, 2021).

[143] House Report, *supra*, at 167.

1    cut off these social apps' access to Facebook users' data because Facebook was fearful that

2    continued access would allow these apps to launch their own competing services that would

3    challenge any one of Facebook's ever-expanding cache of products.[144]  As an example, Facebook

4    penalized Ark, a third-party app that Facebook users could use in conjunction with Facebook, for

5    the manner in which Ark accessed data on Facebook.[145]  A former Facebook employee explained

6    that in mid-2012: "[i]t seemed clear that leadership imposed [a] more severe punishment against

7    Ark because Mr. Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring

8    an acquisition of Ark at the same time as it was being investigated for policy violations."[146]

9        173.    By the end of 2011 and the beginning of 2012, Facebook executives debated a plan

10   to prevent third-party developers from building their own competing social networks that might be

11   capable of generating engagement and data independent of Facebook's network.  Social media

12   applications, such as Line, WeChat, and Instagram were creating their own independent user bases

13   and adding features that made them emerging competitive threats.

14       174.    Facebook's solution to address these potential competitors was a scheme to disrupt

15   the growth of these applications by first attracting third-party app developers to build applications

16   for Facebook's "Platform" and then ultimately remove their access to the APIs, which removed

17   those developers' access to the functionality of Facebook's social network as well as information

18   about Facebook users' friends and extended network, users' interactions with each other, and users'

19   newsfeed posts.  This API access was the central value proposition of Facebook's "Platform."  If

20   developers built apps that enhanced the value of Facebook's social network, they would in return

21   receive the benefits of access to the functionality of Facebook's social network, as well as to

22   interconnections and interactions among Facebook's users—Facebook's social graph.

23       175.    Facebook's shut off of API access deprived app developers of access to the APIs

24   that were most central to their applications, such as Facebook's "Friends" and "Timeline" APIs, as

25   well as other vital APIs, including those relating to messaging.  Facebook's identification of

26

27       [144] *Id.* at 166.

28       [145] *Id.* at 169.

     [146] *Id.*

competitive threats and removal of access to these APIs halted the growth of tens of thousands of third-party applications that relied on these essential APIs and were, in Facebook's view, threatening Facebook's monopolies by eroding the substantial barriers to entry that protected Facebook's business. Facebook's scheme prevented competitive third-party applications from buying consumer data from Facebook, either through its APIs or through its advertising network. As a Facebook executive explained in 2012, Facebook would "not allow things which are at all competitive to 'buy' this data from us."

176. In May 2012, Zuckerberg decided to use the threat of shutting off potential competitors' access from Facebook's "Platform" so that Facebook could extract more data. He instructed executives to demand "reciprocity" agreements from major competitors that used Facebook's "Platform." Facebook then began to block competitors from using its platform and thereby obtaining access to Facebook's data about consumers. Competitors such as Twitter, Instagram, Pinterest, and Foursquare were required to hand over their most valuable asset—their social data—to their rival Facebook in order to retain access to Facebook's APIs and advertising network.

177. Facebook planned to block competitors from using its "Platform," thereby preventing them from eroding the substantial barriers to entry and network effects that protected Facebook's market power. For the companies with social data that Facebook needed to further extend its dominance, Facebook would coerce them into agreements to share their most valuable social data with Facebook. If they refused, Facebook would blacklist them and take it from them anyway with its own crawling software that would scrape their public-facing site for information. What began as a negotiation strategy to extract social data from rivals became the foundation of Facebook's "Platform" strategy. For competitors that posed enough of a threat to create their own rival network, Facebook required them to hand over the only leverage they had—the social data they derived from their users' engagement.

178. Facebook's willingness to copy and penalize competitors through discriminatory access to its social graph also made it easier for Facebook to acquire competitors at a reduced price. For example, during negotiations to acquire Instagram between Zuckerberg and Kevin Systrom,

Instagram's Chief Executive Officer, Zuckerberg tied Instagram's continued access to Facebook "Platform" and Facebook's social graph to Instagram's response to Facebook's acquisition offer:

> At some point soon, you'll need to figure out how you actually want to work with us. This can be an acquisition, through a close relationship with Open Graph, through an arms length relationship using our traditional APIs, or perhaps not at all . . . Of course, at the same time we're developing our own photos strategy, so how we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well.[147]

179. Similarly, in an earlier conversation between Systrom and Matt Cohler, an Instagram investor and former senior Facebook adviser, Systrom and Cohler discussed the possibility that Instagram's response to Facebook's acquisition efforts could affect Instagram's access to Facebook "Platform" down the line.[148] In discussing how to engage with Zuckerberg regarding Facebook's advances, Cohler cautioned: "we need to make it as hard as possible for fb to mess with our ability to get distribution on the platform[.]"[149]

180. In 2015, Facebook cut off all public access to the Friends and News Feed APIs. Facebook had already extracted valuable social network data from dozens of competitors in the run-up to the announcement and ultimate removal of the APIs. This move allowed it to coerce incipient competitive threats to hand over their social network data. Facebook denied API access to thousands of potential competitors, and in the process ensured that its "Platform" would be the only viable "platform" upon which a third-party social media application could be built.

181. Even though it had eliminated public access to the Friends and News Feed APIs, Facebook strong-armed certain competitors into continuing to hand their data over to Facebook through agreements known as "Whitelist and Datasharing Agreements."[150] Facebook demanded

---

[147] *Id.* at 164.

[148] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-00101440, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf (last accessed Apr. 15, 2021).

[149] *Id.*

[150] Facebook provided Whitelist and Data Sharing agreements to the dating apps Tinder and Hinge. To further entrench its social graph and gain even more access to data, it also secretly signed Whitelist and Data Sharing agreements with other third parties, including Netflix, Nissan, and Lyft. In total, dozens of third parties entered into such agreements with Facebook.

that the third-party developers it identified as competitive threats execute a standard form agreement, which Facebook referred to as a "Private Extended API Addendum."[151]   These agreements "enable[d] Developer[s] to retrieve data or functionality relating to Facebook that is not generally available under Platform, which may include persistent authentication, photo upload, video upload, messaging and phonebook connectivity."[152]   Importantly, a third-party developer's "spending substantial sums with Facebook" was "a condition of maintaining preferential access to personal data" through Whitelist and Datasharing Agreements.[153]

182.   As part of this scheme, Facebook also mandated "reciprocity" from these third-party developers, "requiring apps that used data from Facebook . . . share . . . their data back to Facebook (with scant regard to users' privacy)."[154]   Indeed, Facebook's reciprocity policies exponentially multiplied the effect of its deception of users regarding their privacy: "[b]y logging into an app such as Tinder, for instance, the user would not have realized they were giving away all their information on Facebook."[155]

183.   Consistent with Facebook's ploy to maintain its monopolistic grip on the Social Network and Social Media Markets by deceiving consumers about its privacy practices, Facebook's Simon Cross marketed these changes to its third-party access policies as triumphs which bolstered the security of its users' data.   Facebook announced a new slogan, "'People First', because 'if people don't feel comfortable using Facebook and specifically logging in Facebook and using Facebook in apps, we don't have a platform, we don't have developers.'"[156]   In reality, however, Facebook described these changes—and its marketing of these changes—as "the Switcheroo Plan": "Facebook bundled in the decision to cut off third-party access to user data with other unrelated

---

[151] DCMS Report, *supra*, ¶ 85.

[152] *Id.*

[153] *Id.*, ¶ 96.

[154] *Id.*, ¶ 106.

[155] *Id.*

[156] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data to Apps*, TechCrunch (Apr. 28, 2015), available at https://techcrunch.com/2015/04/28/facebook-api-shut-down/ (last accessed Apr. 15, 2021).

privacy updates, and explained it all under the new slogan 'people first.'"[157]  "The fact that user data would still be available to some third parties, as long as the companies gave Facebook enough money and didn't pose a competitive threat, was conveniently elided."[158]

184.    Absent these agreements and Facebook's overall scheme to eliminate nascent competitors, other companies could have created their own social networks and social media applications.  As the amount of user data was generated and monetized on these other networks and applications, the substantial barriers to entry in the Social Network and Social Media Markets would have eroded.  But because Facebook could coercively demand all of the data generated on a competing "platform," the Whitelist and Data Sharing Agreements ensured that competitive threats could not challenge Facebook's stranglehold over the data, which Facebook obtained by leveraging its monopolies in the Social Network and Social Media Markets.

185.    In all of its conduct surrounding potential acquisitions, Facebook intentionally surveilled, copied, acquired, and killed competitors with the specific intent, and result, of destroying competition.  Facebook acquired and maintained its monopolies in the Social Network Market and the Social Media Market due to its predatory and anticompetitive conduct that went on during its string of acquisitions, with a specific intent to monopolize, and with a dangerous probability at the outset and, ultimately, its present day success in obtaining and maintaining its market power.

### Instagram

186.    Facebook used the undisclosed surveillance of its users to identify Instagram as a threat and ultimately to acquire the company.  Instagram is a photo-sharing mobile application founded by Kevin Systrom, which allowed users to check in, post plans, and share photos.  The photo sharing feature immediately became the app's most popular feature.

187.    Instagram launched on Apple's mobile device operating system in 2010, immediately becoming the top free photo-sharing app on Apple's App Store.  On its very first day,

---

[157] Elena Botella, *Facebook Earns $132.80 From Your Data per Year*, Slate (Nov. 15, 2019), available at https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html (last accessed Apr. 15, 2021).

[158] *Id.*

CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT

Instagram was downloaded 25,000 times.  By December 2010, just several months after it had launched, Instagram had been downloaded 1 million times.

188.    By March 2012, Instagram enjoyed 27 million users.  One month later, in April 2012, Instagram became available on Android devices.  Just 10 days after its Android launch, Instagram's overall user base jumped by 10 million, surpassing 40 million.[159]  As a result, Instagram was poised to receive additional funding based on a valuation of $500 million.

189.    Facebook recognized that Instagram posed a danger to Facebook's dominance.  Instagram's superior photo-sharing feature gave Instagram a hook to amass a large user base.  Had its user base continued to grow, and had it continued to add features, Instagram could have threatened Facebook's stranglehold, not only on the Social Media Market, but also on the Social Network Market as well.  As such, Facebook obsessively tracked Instagram's rise, including through intelligence that it received from surveilling Facebook users' behavior and that it obtained from Onavo.[160]

190.    Both line employees and high-level executives at Facebook recognized Instagram as a competitive threat.  In an internal Facebook message, one engineer mused that "Instagram is eating our lunch.  We should've owned this space, but we're already losing quite badly."[161]  At an internal meeting with Facebook employees, Zuckerberg put it bluntly: the "bad news is that [Instagram is] growing really quickly, they have a lot of momentum, and it's going to be tough to dislodge them."[162]

---

[159] Andrew Webster, *Instagram surpasses 40 million users ten days after Android launch*, The Verge (Apr. 13, 2012), available at https://www.theverge.com/2012/4/13/2946602/instagram-40-million-users (last accessed Apr. 9, 2021).

[160] Mike Swift, *Facebook's history with Onavo resonates for privacy experts worried about Giphy purchase*, mlex Market Insight (June 23, 2020), available at https://mlexmarketinsight.com/insights-center/editors-picks/area-of-expertise/data-privacy-and-security/facebooks-history-with-onavo-resonates-for-privacy-experts-worried-about-giphy-purchase (last accessed Apr. 15, 2021).

[161] House Report, *supra*, at 163.

[162] *Id.*

191.    Consistent with its strategy of "copying" would-be competitors, Facebook initially attempted to create its own product that competed with Instagram.  By June 2011, Facebook had begun developing its own photo-sharing app.[163]  One Facebook employee referred to Facebook's anticipated photo-sharing app as "an Instagram clone."[164]  Facebook subsequently released Facebook Camera, a standalone app allowing users to shoot, filter, and share photos from their mobile devices.[165]

192.    In addition to "cloning" Instagram, Facebook determined there was another way to hedge its bets, protect its monopoly, and neutralize the competitive threat of Instagram: simply buying Instagram outright.  Accordingly, after direct talks with Mark Zuckerberg, Facebook offered to purchase Instagram for $1 billion in April 2012.

193.    In addition to the $1 billion price tag, another consideration motivated Instagram's evaluation of Facebook's acquisition offer: Facebook's aggressive and anticompetitive threats, which Facebook was safe to make due to its status as a monopolist.  During negotiations between Facebook and Instagram, Zuckerberg warned Kevin Systrom, Instagram's Chief Executive Officer, that "[a]t some point soon, you'll need to figure out how you actually want to work with us. . . . [H]ow we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well."[166]  In a separate communication with Matt Cohler—an Instagram investor and Facebook's former Vice President of Product Management—Systrom inquired whether Zuckerberg "will go into destroy mode if I say no" to Facebook's acquisition offer.[167]  Cohler responded that Zuckerberg would "probably" go into

[163] MG Siegler, *Behold: Facebook's Secret Photo Sharing App*, TechCrunch (June 15, 2015), available at https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.238331010.340941203.1606233329-687565188.1605321310 (last accessed Apr. 5, 2021).

[164] House Report, *supra*, at 163.

[165] Josh Constine, *FB Launches Facebook Camera – An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*, TechCrunch (May 24, 2012), available at https://techcrunch.com/2012/05/24/facebook-camera/ (last accessed Apr. 15, 2021).

[166] House Report, *supra*, at 163–64.

[167] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-00101438, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf (last accessed Apr. 15, 2021).

"destroy mode" and "conclude that it's best to crush Instagram[.]"[168]  Cohler further lamented that "I don't think we'll ever escape the wrath of [M]ark" Zuckerberg.[169]

194.   Clearly crushed into submission and fearful of Facebook's "wrath," Instagram acceded to Facebook's acquisition demand.  Facebook consummated the deal immediately prior to its IPO.

**Snapchat**

195.   Following its acquisition of Instagram, Facebook excluded third-party apps that provided photo and video sharing functionality from Facebook's "Platform."  If an image sharing or video app contained an important feature, Facebook simply cloned it, thus paving the way for excluding a competitive rival from its "Platform," while simultaneously taking away that rival's share of users.  And, high-level Facebook executives were acutely aware of this strategy.[170]

196.   For example, by 2012, the photo-sharing app Snapchat had grown in popularity among consumers.  Founded by Evan Spiegel, Snapchat allows users on that application to send each other communications—including text, photos, and videos—which appear only for a fixed period of time and then disappear.[171]  Drawn by Snapchat's privacy appeal, users began to flock to Snapchat.

197.   Facing a competitive threat from Snapchat, Facebook engaged in its usual "copy, acquire, kill" strategy in an attempt to annihilate Snapchat.  To formulate that strategy, Facebook relied on data it obtained from Onavo.[172]

---

[168] *Id.* at FB-HJC-ACAL-00101438–39.

[169] *Id.* at FB-HJC-ACAL-00101440.

[170] Executives such as Zuckerberg, Sheryl Sandberg (Facebook's Chief Operating Officer), and Sam Lessin (Facebook's Product Management Director), expressly endorsed "cloning" other competing applications' popular features.  *See* House Report, *supra*, at 163.

[171] Srinivasan, *supra*, at 53.

[172] Karissa Bell, *"Highly confidential" documents reveal Facebook used VPN app to track competitors*, Mashable (Dec. 5, 2018), available at: https://mashable.com/article/facebook-used-onavo-vpn-data-to-watch-snapchat-and-whatsapp/ (last accessed Apr. 15, 2021).

198.    In December 2012, Facebook launched "Poke," a standalone app designed to allow users to send photos, videos, or Facebook messages to each other that expire after a few seconds.[173] But to Facebook, the possibility of competing with Snapchat on the merits provided insufficient guarantee that Facebook's monopoly position would be secure.  So, mere days before Facebook launched Poke, Zuckerberg met with Spiegel, Snapchat's founder, in Los Angeles.[174]  During the meeting, Zuckerberg described Facebook's soon-to-be-released Poke app to Spiegel.  Spiegel has described Zuckerberg's representations during the meeting as follows: "It was basically like, 'We're going to crush you.'"[175]

199.    After the meeting and following Facebook's launch of Poke, Facebook made additional overtures to Snapchat in an attempt to cement its top-of-the-ladder status.[176]  Facebook ultimately offered $3 billion to acquire Snapchat.  Facebook's $3 billion offer made clear that Facebook was willing to pay a premium over Snapchat's then-existing market value for the added security of neutralizing a possible threat to Facebook's market dominance.

200.    Snapchat rejected Facebook's offer, and Facebook responded by copying *even more* of Snapchat's features that are popular with consumers.  For example, Snapchat's "Stories" feature allows Snapchat users to post a collection of images and video in a rapid string that other Snapchat users may view for 24 hours.  In 2016, Facebook (through Instagram) launched its own feature—also called "Stories"—which is "nearly identical" to Snapchat's version.[177]  By April 2017,

---

[173] Josh Constine, *Facebook Launches Snapchat Competitor 'Poke', An iOS App for Sending Expiring Text, Photos, And Videos*, TechCrunch (Dec. 21, 2012), available at: https://techcrunch.com/2012/12/21/facebook-poke-app/ (last accessed Apr. 15, 2021).

[174] J.J. Colao, *The Inside Story Of Snapchat: The World's Hottest App Or A $3 Billion Disappearing Act?*, Forbes (Jan. 20, 2014), available at https://www.forbes.com/sites/jjcolao/2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-act/?utm_campaign=forbestwittersf&utm_medium%0b=social&utm_source=twitter&sh=3e058aae67d2 (last accessed Apr. 15, 2021).

[175] *Id.*

[176] *Id.*

[177] Casey Newton, *Instagram's new stories are a near-perfect copy of Snapchat stories*, The Verge (Aug. 2, 2016), available at https://www.theverge.com/2016/8/2/12348354/instagram-stories-announced-snapchat-kevin-systrom-interview (last accessed Apr. 15, 2021).

Facebook's "Stories" feature on Instagram had become more popular than Snapchat's version, crippling one of Facebook's largest rivals.[178]

### **WhatsApp**

201.    Facebook's acquisition of WhatsApp followed a similar pattern.  WhatsApp began as a mobile application that displayed user statuses in an address book on a smartphone.  However, WhatsApp exploded in popularity when Apple introduced "push notifications" for the iPhone, allowing developers to ping app users even when they weren't using the app.  This feature became a form of instant messaging, enabling users to broadcast messages to connections within a user's social network, which was built from their phone's contact list.  Because WhatsApp used the mobile phone's internet connection rather than text messages over the phone's cellular connection, the app allowed users to avoid text messaging fees entirely.  WhatsApp's ability to send messages to any user with a phone using the internet was its most sought-after feature.

202.    As WhatsApp's popularity began to rise in the early 2010s, Facebook harvested user engagement data from Facebook's Onavo spyware in order to carefully track WhatsApp.  The data reported that WhatsApp was rivaling Facebook's own Messenger product, and held third place in terms of user reach among mobile messenger apps for iPhone in the U.S. as of April 2013.  Facebook used Onavo's data to track messages sent through WhatsApp, which more than doubled messages on Facebook's own mobile product.  This same Onavo data showed massive engagement among WhatsApp users, placing it in fifth place behind Facebook's own core product; Facebook's newly acquired Instagram; Twitter; Foursquare; and Snapchat.  WhatsApp threatened Facebook's business—including the barriers to entry and network effects protecting Facebook's dominance— and because of Onavo, Facebook knew that WhatsApp was a direct threat to Facebook's monopoly power.

203.    Facebook then sought to remove WhatsApp as a competitor in order to ensure that Facebook retained its monopoly power in the Social Network and Social Media Markets.  Facebook used the insights it had gained from Onavo's data surveillance technology to purchase WhatsApp

---

[178] Kaya Yurieff, *Instagram's Snapchat clone is more popular than Snapchat*, CNN Business (Apr. 13, 2017), available at https://money.cnn.com/2017/04/13/technology/instagram-stories-snapchat/index.html (last accessed Apr. 15, 2021).

in 2014 for close to $22 billion, well above its initial bid of $16 billion. The transaction made no economic sense for Facebook, other than foreclosing competition in the Social Media and Social Network Markets and protecting Facebook's monopoly power. WhatsApp's revenues were a meager $10.2 million in 2013. Its six-month revenue for the first half of 2014 totaled $15.9 million, and the company had incurred a staggering net loss of $232 million in that same period. Facebook had paid twenty billion dollars—thousands of times WhatsApp's revenues—to acquire a money-losing company that created software functionality Facebook itself already had as part of its own products, and could easily build from scratch for a fraction of the cost of the acquisition.

## Other Examples of Facebook's "Copy, Acquire, Kill" Strategy

204. In addition to the examples described herein, Facebook has employed its "copy, acquire, kill" strategy against other would-be competitors, and the extent to which it did so based on deceptively-obtained user data only first began to become known recently. For example, data that Facebook collected from Onavo reportedly put "Houseparty"—a social network that referred to itself as "the internet's living room"—in Facebook's crosshairs.[179]

205. After Houseparty turned down an acquisition offer from Facebook, Facebook announced that its Messenger app would become a "virtual living room." Houseparty's active user base fell by half between 2017 and 2018.

206. As another example, Facebook acquired Giphy for $400 million in May 2020. Although Giphy's primary function is to allow users to share GIFs[180] online and through messaging apps, the transaction will also give Facebook competitive insights into other messaging apps. One commenter said, "While you may successfully block trackers like the Facebook ad pixel following

---

[179] Rachel Sandler, *People are furious about Onavo, a Facebook-owned VPN app that sends your app usage habits back to Facebook*, Business Insider (Feb. 14, 2018), available at https://www.businessinsider.com/what-is-facebooks-onavo-protect-virtual-private-network-app-2018-2?r=US&IR=T (last accessed March 29, 2021).

[180] A "GIF" is a compilation of still images, akin to a flipbook, played in sequence to create a short animated sequence.

1  you around online, or even delete your Facebook account, the majority of us wouldn't suspect we're

2  being monitored when we're sending funny images to friends."[181]

3      207.    In addition, Facebook has sometimes acquired companies without the goal of

4  incorporating them into its own business, but rather, simply to eliminate the competitor, a practice

5  referred to as "catch and kill."  For example, Facebook acquired "tbh"—an anonymous social media

6  app—in October 2017.  It then shut the app down less than a year later, having made little effort to

7  maintain the application.[182]

8      208.    Facebook's acquisition conduct is part of an ongoing attempt to entrench its market

9  power in the Social Network and Social Media Markets.  Facebook's strategy was made possible

10  due to the social data that Facebook obtained as it acquired its monopolies.  And, Facebook has

11  used that data in order to copy, acquire, or kill competitors, instead of competing with them by

12  providing enhanced data privacy protections to consumers.

13  **G.    Facebook's Use of Onavo Comes to Light.**

14      209.    Ultimately, the world learned the truth about the extent of commercial surveillance

15  that technology like Onavo's made possible for Facebook.  In August 2018, Apple removed Onavo

16  from its app store following reporting that Facebook was using the app to track users and other

17  apps.  Apple ejected Facebook's Onavo app from its marketplace because it violated Apple's rules

18  prohibiting apps from using data in ways far beyond what is required to run the app and provide

19  advertising.  In other words, because Onavo Protect was leveraging far more data than any VPN

20  could conceivably need, it was clear that the true purpose of the app was to spy on Onavo users,

21  and Apple would not allow it.  An Apple spokesperson said the company intended to make "it

22  explicitly clear that apps should not collect information about which other apps are installed on a

23

24

25

26      [181] Owen Williams, *How Facebook Could Use Giphy to Collect Your Data*, ONEZERO,
   May 15, 2020, available at https://kl.link/34AW951 (last accessed Apr. 15, 2021).

27      [182] *See* Kaya Yurieff, *Facebook Shutters the Teen App it Just Bought*, CNN Business (July

28  3, 2018), available at https://kl.link/37G6HBH (last accessed Apr. 15, 2021).

1    user's device for the purposes of analytics or advertising/marketing and must make it clear what

2    user data will be collected and how it will be used."[183]

3         210.   The amount of commercial surveillance that Onavo's technology enabled was jaw-

4    dropping.  Facebook's Onavo Protect app reported on users' activities whether their screens were

5    on or off, whether they used WiFi or cellular data, and even when the VPN was turned off.  There

6    was simply no rational relationship between the data collected and the purported purpose of the

7    application.  Put simply, a VPN that collected data even when the VPN was off was an obvious

8    subterfuge for spying on users and user behavior.

9         211.   Facebook tried to circumvent Apple's ban by repackaging its Onavo spyware as a

10   Facebook Research VPN app.  Facebook sidestepped the App Store by rewarding teenagers and

11   adults when they downloaded the Research app and gave it root—superuser—access to network

12   traffic on their mobile devices.  Facebook has been leveraging its Onavo code in similar ways since

13   at least 2016, administering the program under the codename "Project Atlas"—a name suited to its

14   goal of surveilling app usage on mobile devices in real time.

15        212.   When the news broke in January 2019 that Facebook's Research apps were

16   repackaged Onavo apps designed to spy on users, Facebook immediately withdrew the programs

17   from the Apple App store.  Apple again concluded that Facebook had tried to violate its policies by

18   obtaining a level of administrative privileges on an iPhone or iPad that would have been designed

19   for the internal IT department of the device user's employer.

20        213.   In addition to Onavo's Protect app, Facebook has attempted to deploy its

21   surveillance software as other forms of utility applications that require extensive or privileged

22   access to mobile devices.  For example, Facebook released the Onavo Bolt app, which Facebook

23   represented would allow a user to block unauthorized access to particular apps on the user's phone,

24   unless a particular passcode, fingerprint, or other information was provided.  In reality, however,

25   Onavo Bolt covertly surveilled users and sent Facebook the results.  Facebook also shut that app

26

27   _____

     [183] Ari Levy, *Apple removes Facebook's Onavo security app from the App Store*, CNBC
28   (Aug. 22, 2018), available at https://www.cnbc.com/2018/08/22/apple-removes-facebook-onavo-
     app-from-app-store.html (last accessed Apr. 22, 2021).

1    down the very day that its surveillance functionality was discovered. The Onavo Bolt app had been

2    installed approximately 10 million times.

3    **H.    Facebook's Anticompetitive Practices Have Harmed and Continue to Harm**

4         **Competition in the Social Network and Social Media Markets.**

5         214.    Facebook's anticompetitive practices described above have harmed and continue to

6    harm competition in the Social Network and Social Media Markets in the United States.[184]

7         215.    Facebook is dangerously close to obtaining, or has obtained, monopoly power in the

8    Social Network and Social Media Markets in the United States, and it has wielded that power to

9    anticompetitively foreclose competition.

10        216.    Facebook's deception of consumers has harmed, and continues to harm,

11   competition. In many markets, the advantage of consumer deception quickly dissolves once the

12   deception is uncovered. But the direct and indirect network effects inherent in the Social Network

13   and Social Media Markets create markets with strong network effects and high barriers to entry.

14   Because of unduly high switching costs, users cannot simply switch to a competitor once the

15   dominant player's deception is exposed, even though they wanted to do so, as evidenced by the

16   "#DeleteFacebook" movement after the revelations regarding Cambridge Analytica in 2018.

17        217.    Facebook's deception about its lack of privacy protections acted as a welcome sign,

18   inducing a ground swell of users to join Facebook because of Facebook's avowed privacy appeal.

19   But once a critical mass of users, continually expanding due to strong network effects obtained

20   through its deception, joined Facebook at the expense of its competitors, Facebook slammed the

21

---

22   [184] As a former Assistant Attorney General for the DOJ's Antitrust Division has explained,
     "[i]t is well-settled . . . that competition has price and non-price dimensions." Makan Delrahim,

23   Assistant Attorney General, U.S. Dep't of Justice Antitrust Div., Remarks for the Antitrust New

24   Frontiers Conference (June 11, 2019), available at: https://www.justice.gov/opa/speech/assistant-
     attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers. Similarly, when asked

25   whether "when . . . conducting competition analysis in the tech industry, non-price factors should
     be considered," Facebook CEO Mark Zuckerberg testified before the United States House of

26   Representatives Committee on Energy & Commerce that "the law already includes quality of
     products in addition to price." *Social Media's Role in Promoting Extremism and Misinformation*,

27   117th Cong. (Mar. 25, 2021), video available at https://energycommerce.house.gov/committee-
     activity/hearings/hearing-on-disinformation-nation-social-medias-role-in-promoting (starting at

28   4:31:40).

door shut.  Because of high switching costs—including the possibility of losing contact with friends, family and acquaintances, an inability to access data that Facebook users have spent years or more inputting into Facebook, and the time and opportunity cost of starting over with a competitor—and the lack of viable alternatives as a result of Facebook's deception, consumers are now trapped.  As a result, Facebook has cheated its way to the finish line in the race for dominance without being the best competitor.  Instead of providing consumers a way out, such as alternatives to Facebook, the Social Network and Social Media Markets help to lock in Facebook's unfair advantage.

218.    Facebook's acquisition conduct also has harmed, and continues to harm, competition.  Facebook built and maintained its monopolies over the Social Network and Social Media Markets by exploiting deceptively-obtained user data to target competitive threats, which Facebook then proceeded to acquire, copy, or kill.  Facebook tracked its users across the internet, often without permission, to identify companies that might threaten its monopoly.  Facebook then used a pattern of discriminatory data access to destroy potential competitors or force them to sell at a discount.  Facebook's policy of shutting off these firms' access to Facebook's valuable user data if Facebook declared them competitive threats stymied the emergence of competing social networks and social media applications.  Put simply, Facebook used its data advantage not to run faster, but to kneecap the competition.  That approach is not surprising given the win-at-all-costs culture at Facebook.

219.    Facebook's two-pronged anticompetitive strategy harmed competition in the Social Network and Social Media Markets.  As detailed herein, Facebook's strategies made it nearly impossible for competitors—both nascent and established—to challenge Facebook's monopoly by competing with Facebook on data privacy protections or by building a higher quality social network.

220.    But for Facebook's anticompetitive practices, consumers would have had more options in the Social Network and Social Media Markets for accessing content and connecting with other users.  Those companies would have created social networks and social media applications that competed with Facebook on the merits of data privacy protections and social network and

1    social media application quality, without being dependent on Facebook for comprehensive data.

2    Because Facebook anticompetitively restrained competition in its efforts to acquire and obtain

3    social media and social network monopolies, competition along the dimensions of user privacy and

4    product quality was foreclosed.  Ultimately, consumers suffered, and continue to suffer, as a result

5    of Facebook's wantonly anticompetitive conduct.

6    **I.      Facebook's Anticompetitive Conduct Has Directly and Quantifiably Damaged**

7    **Consumers.**

8            221.    Facebook's anticompetitive practices described herein have harmed, and continue

9    to harm, consumers in the Social Network and Social Media Markets in the United States.

10           222.    Facebook's anticompetitive foreclosure of competition has harmed consumers in

11   many ways.  When  using Facebook's products, consumers agree to give up things of material

12   value: personal information and attention.  Facebook then sells for money, measurable in

13   quantifiable units, its users' information and attention to third parties, including advertisers.  But

14   for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated

15   competition, consumers would have had more choices in the Social Network and Social Media

16   Markets, instead of the few, if any, they have today.

17           223.    Vigorous competition would have benefitted consumers by requiring social

18   networks and social media applications to employ those business models which best attract and

19   retain users.  When consumers agree to use Microsoft's "Bing" search engine and allow Microsoft

20   to collect their data, Microsoft, for example, compensates consumers with items of monetary

21   value.[185]    Similarly, users who agree to provide their web browsing history to the Nielsen

22

23

24

25

26

---

27   [185] Lisa Marie Segarra, *Microsoft Will Pay You to Use Bing Instead of Google*, Fortune
     (June 3, 2017), available at https://fortune.com/2017/06/03/microsoft-pay-use-bing-google/ (last
28   accessed Mar. 29, 2021).

Corporation's Computer and Mobile Panel can receive $50.00 a year.[186] Honeygain—a service that allows users to share their internet access data—compensates users up to $19.00 a month.[187]

224. Between 2016 and 2019—pursuant to its secret "Project Atlas"—Facebook itself paid users between the ages of 13 and 35 up to $20.00 per month in return for access to those users' emails, private messages in social media apps, photos and videos, web browsing and search activity, and even location information.[188] Facebook cloaked its involvement by naming the app "Research" and advertising it through services that did not carry the Facebook moniker, including BetaBound, uTest, and Applause.[189] These ads prominently advised that participants would be compensated monetarily for their data:



---

[186] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed Mar. 29, 2021).

[187] Honeygain, *How Our PayPal Payouts Are Done? Step by Step Instructions* (Dec. 17, 2019), available at https://www.blog.honeygain.com/post/paypal-payouts-step-by-step-instructions (last accessed March 29, 2021).

[188] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TechCrunch (Jan. 29, 2019), available at https://techcrunch.com/2019/01/29/facebook-project-atlas/ (last accessed Apr. 1, 2021).

[189] *Id.*

225.    Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased incremental value in return for consumers' data.  Otherwise, consumers would have given their data and attention to other social networks and social media applications, which would have provided consumers increased incremental value.  Consumers would have received the fair market value for their data and attention.[190]  That value was artificially decreased by Facebook's anticompetitive conduct.

226.    Absent Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social network and social media application quality.  Indeed, more robust competition would have benefitted consumers with increased innovation (including the development of superior product features) and increased consumer choice (including the ability to select a social network or social media application which offers consumers services that more closely align with the consumers' preferences, such as with respect to the content displayed, quantity and quality of advertising, and options regarding data collection and usage practices).  Consumers could have benefitted from Facebook's social network and social media offerings without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising.[191]  Similarly, consumers could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as lower ad loads, interoperability between applications, and portability of users' data.  In the absence of this competition, many consumers

---

[190] Facebook indisputably recognizes that its users' data has monetary value.  In addition to secretly paying users who shared information outside of Facebook, Instagram, and WhatsApp as part of "Project Atlas," Facebook, in 2019, for example, touted that its ARPU was over $41.00 per user in the United States and Canada.  And, in the aftermath of its IPO, Facebook executives openly discussed a "Data for $" plan, explaining "we are wanting to put a $ amount on data and a $ amount on distribution."  *See* Goodwin, *supra*.

[191] As FTC Commissioner Rohit Chopra explained in his testimony before the House Antitrust Subcommittee—with respect to Facebook in particular—"changes to terms of service hidden in the fine print where they can collect more and more data and unilaterally impose these terms, that is a price hike.  We are paying with our data, that valuable data[.]"  *Online Platforms and Market Power, Part 3: The Role of Data and Privacy in Competition*, 116th Cong. (Oct. 18, 2020), transcript available at https://www.congress.gov/116/chrg/CHRG-116hhrg39840/CHRG-116hhrg39840.pdf (page 115).

1  trapped in Facebook's social network and social media offerings have reduced their use of these

2  products.

3  227.   If Facebook had disclosed the scope of the data it collected and the level of fine-

4  grained targeted marketing that it enabled, consumers would have benefitted from competition in

5  the Social Network and Social Media Markets, resulting in a better Facebook or better alternatives

6  and lower consumer costs in the form of information and attention.   Instead, Facebook has

7  artificially stifled innovation, thrusting on consumers a product of reduced-quality and leaving

8  consumers with no meaningful alternative.

9  228.   If Facebook had not used its social network and social media monopolies to target

10  its competition for destruction, consumers would have benefitted from more competition, and hence

11  more options and lower costs, in the Social Network and Social Media Markets.   As elected officials

12  have recognized, absent Facebook's anticompetitive acquisition strategy, Facebook would have

13  had to compete on privacy issues, benefiting consumers:[192]



22  229.   Because Facebook engaged in the anticompetitive practices described above,

23  consumers suffered substantial, cognizable, and quantifiable economic harm.   Unless these acts are

24  enjoined, consumers will continue to suffer harm caused by Facebook's anticompetitive practices.

25

26

27  _____

  [192] United States Representative Ro Khanna, Twitter (Jan. 25, 2019), available at

28  https://twitter.com/reprokhanna/status/1088850988218413058?lang=en (last accessed Apr. 15, 2021).

# V.    STATUTE OF LIMITATIONS

## A.    Accrual of Claim

230.    Plaintiffs did not discover the existence of the anticompetitive acts alleged herein until, at the earliest, March 17, 2018.  As the House Antitrust Subcommittee recently explained, "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of scandals involving large-scale data breaches or privacy incidents such as Cambridge Analytica."[193]

231.    It was not until the media uncovered the details of the Cambridge Analytica scandal on March 17, 2018, that consumers began to discover Facebook's anticompetitive practices that harmed consumers and that would have enabled consumers to raise the claims presented in this action.  Indeed, the U.K. House of Commons' Digital, Culture, Media and Sport Committee has specifically recognized that prior to at least, and no earlier than, March 2018, "Facebook users had *no idea* that their data was able to be accessed by developers unknown to them, despite the fact that they had set privacy settings, specifically disallowing the practice."[194]

232.    Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22, 2018, that consumers learned of the additional facts regarding Facebook's anticompetitive practices necessary for consumers to raise the claims presented in this action.  Importantly, the Australian Competition and Consumer Commission—which has launched its own action against Facebook arising out of its deceptive use of Onavo—has asserted that, generally, "nowhere on the Onavo Protect website, the Apple App Store, the Google Play Store, or in the advertising for Onavo Protect did Facebook or Onavo disclose to consumers . . . that Onavo Protect would not protect and keep secret users' personal activity data, or that Facebook or Onavo would use personal activity data collected from users for the commercial benefit of Facebook or Onavo."[195]

---

[193] House Report, *supra*, at 54.

[194] DCMS Report, *supra*, ¶ 75 (emphasis added).

[195] ACCC Complaint, *supra*, ¶ 8.

1  **B.      Equitable Tolling**

2         233.    Nor could plaintiffs have discovered, through the exercise of reasonable diligence,

3  the existence of the anticompetitive acts alleged herein until, at the earliest, March 2018.  Facebook

4  did not adequately disclose its deception, nor did its privacy policies themselves make clear to

5  consumers the scope of data it collected, the third parties who could access this data, and how this

6  data could be used.  Facebook's privacy policies are dense and opaque.[196]  Tellingly, Richard

7  Allan—Facebook's then-Vice President of Policy Solutions—conceded, in testimony to the U.K.

8  House of Commons' Digital, Culture, Media and Sport Committee, that "there are very valid

9  questions about how well people understand [Facebook's privacy] controls and whether they are

10  too complex."[197]

11         234.    Firms like Facebook that collect vast amounts of data from consumers often further

12  obfuscate their data privacy policies to make them even more difficult for consumers to understand.

13  Indeed, "these policies tell you very little about the data these websites have on you.  And that's

14  the point. . . . They know that if they tell people every single way they're collecting information

15  and using it, then most users will share less information, which would mean less money for

16  them."[198]

17         235.    Accordingly, as the House Antitrust Subcommittee has recognized, "nuances in

18  privacy terms are relegated to investigative journalists to discover and explain."[199]  The subsequent

19  investigative reporting that brought to light Facebook's systematic deception and commercial

20  surveillance was not made public until, at the earliest, March 17, 2018, following the Cambridge

21  Analytica scandal.

22         236.    As such, the statute of limitations should be equitably tolled to at least March 2018.

23  Accordingly, all of the anticompetitive conduct described in this complaint presents timely claims,

24

25         [196] House Report, *supra*, at 54.

26         [197] DCMS Report, *supra*, ¶ 82 (emphasis added).

27         [198] Marcus Moretti and Michael Naughton, *Why Privacy Policies Are So Inscrutable*, The
Atlantic     (Sept.     5,     2014),     available     at     https://www.theatlantic.com/technology/archive/
2014/09/why-privacy-policies-are-so-inscrutable/379615/ (last accessed Apr. 1, 2021).

28         [199] House Report, *supra*, at 54.

including Facebook's deception and acquisition conduct going back to before it achieved its social network and social media monopolies.

## C. Fraudulent Concealment

237. Facebook fraudulently concealed its deceptive practices and commercial surveillance efforts, including the extent of its data privacy practices and anticompetitive acquisition strategy. As a result, Plaintiffs and Class members were unaware of Facebook's unlawful conduct alleged herein.

238. Facebook affirmatively and fraudulently concealed its unlawful conduct by, *inter alia*, publicly misrepresenting, before and after its 2011 settlement with the FTC—which "barred [Facebook] from making misrepresentations about the privacy or security of consumers' personal information"—that it was protecting users' privacy. Examples of such public statements include:

> **a)** Mark Zuckerberg's September 8, 2006 statement posted on Facebook, representing that "**we have built extensive privacy settings** – **to give you even more control** over who you share your information with"; apologizing that Facebook's privacy mishap regarding its News Feed feature "**was a big mistake on our part, and I'm sorry for it**"; and explaining that "apologizing isn't enough. I wanted to make sure we did something about it, and quickly. So **we have been coding nonstop** for two days **to get you better privacy controls**."[200]

> **b)** Mark Zuckerberg's December 6, 2007 statement, posted on Facebook's Newsroom, explaining that Facebook intended that its Beacon feature "would give people an easy and controlled way to share more . . . information with their friends"; acknowledging that "[i]t took us too long after people started contacting us to change the product . . . [i]nstead of acting quickly, we took too long to decide on the right solution"; and reassuring that while "I'm not proud of the way we've handled this situation," "**I know we can do better**."[201]

---

[200] Mark Zuckerberg, *An Open Letter from Mark Zuckerberg*, Facebook (Sept. 8, 2006), available at https://www.facebook.com/notes/facebook/an-open-letter-from-mark-zuckerberg/2208562130/ (last accessed Apr. 18, 2021) (emphases added).

[201] Mark Zuckerberg, *Announcement: Facebook Users Can Now Opt-Out of Beacon Feature*, Facebook Newsroom (Dec. 6, 2007), available at https://about.fb.com/news/2007/12/announcement-facebook-users-can-now-opt-out-of-beacon-feature/ (last accessed Apr. 20, 2021) (emphasis added).

c)      Facebook's May 26, 2010 statement posted on its Newsroom, indicating that Facebook "will give the more than 400 million people who use Facebook the power to **control exactly who can see** the information and content they share"; that "People have control over how their information is shared"; that "**Facebook does not share personal information with people or services users don't want**"; that "Facebook does not give advertisers access to people's personal information"; and that "**Facebook does not sell any of people's information to anyone**."[202]

d)      Mark Zuckerberg's May 27, 2010 statement on NPR that "There's this false rumor that's been going around which says that **we're sharing private information with applications** and **it's just not true**."[203]

e)      Mark Zuckerberg's November 29, 2011 statement, posted on Facebook's Newsroom, indicating that "I founded Facebook on the idea that people want to share and connect with people in their lives, but to do this **everyone needs complete control over who they share with at all times**."[204]

f)      Mark Zuckerberg's November 29, 2011 statement, posted on Facebook's Newsroom, indicating that Facebook's settlement with the FTC "means we're making a clear and formal long-term **commitment to** do the things we've always tried to do and planned to keep doing – **giving you tools to control who can see your information** and then **making sure only those people you intend can see it**."[205]

---

[202] Facebook, *Facebook Redesigns Privacy*, Facebook Newsroom (May 26, 2010), available at https://about.fb.com/news/2010/05/facebook-redesigns-privacy/ (last accessed Apr. 1, 2021) (emphases added).

[203] Mark Memmott, *Facebook's Zuckerberg Argues Against Making 'Privacy' Your 'Default Setting'*, SCPR (May 27, 2010), available at: https://www.scpr.org/news/2010/05/27/15527/facebooks-zuckerberg-argues-against-making-privacy/ (last accessed Apr. 1, 2021) (emphases added).

[204] Mark Zuckerberg, *Our Commitment to the Facebook Community*, Facebook Newsroom (Nov. 29, 2011), available at https://about.fb.com/news/2011/11/our-commitment-to-the-facebook-community/ (last accessed Apr. 1, 2021) (emphasis added).

[205] *Id.* (emphases added).

**g)**     Mark Zuckerberg's February 1, 2012 statement to prospective shareholders in connection with Facebook's IPO filing, indicating that "At Facebook, we build tools to help people connect with the people they want and **share what they want**[.] . . . We also believe that **giving people control over what they share is a fundamental principle**[.]"[206]

**h)**     Facebook's September 30, 2012 statement, posted on its Newsroom, indicating that "We . . . recognize that **our users trust us to protect the information they share** on Facebook.  **Maintaining that trust is a top priority** as we continue to grow."[207]

**i)**     Mark Zuckerberg's June 8, 2013 statement, posted on Facebook's Newsroom, regarding Edward Snowden's allegations of government surveillance: "We will continue fighting aggressively to keep your information safe and secure."[208]

**j)**     Mark Zuckerberg's March 13, 2014 statement on his own Facebook page responding to allegations that the National Security Agency posed as Facebook during a controversial surveillance program: "To keep the internet strong, we need to keep it secure.  That's why at Facebook **we spend a lot of our energy making our services and the whole internet safer and more secure**. . . . Together, we can build a space that is greater and a more important part of the world than anything we have today, but is also safe and secure.  **I'm committed to seeing this happen, and you can count on Facebook to do our part**."[209]

**k)**     Facebook Product Manager Melissa Luu-Van's July 30, 2015 statement, posted on Facebook's Newsroom, indicating that: "We want everyone to have a safe experience on

---

[206] Reuters Staff, *Zuckerberg's letter to investors*, Reuters (Feb. 1, 2012), available at https://www.reuters.com/article/us-facebook-letter/zuckerbergs-letter-to-investors-idUSTRE8102MT20120201 (last accessed Apr. 1, 2021) (emphases added).

[207] Facebook, *Relevant Ads That Protect Your Privacy*, Facebook Newsroom (Sept. 30, 2012), available at https://about.fb.com/news/2012/09/relevant-ads-that-protect-your-privacy/ (last accessed Apr. 1, 2021) (emphases added).

[208] Mark Zuckerberg, *Personal Response From Mark Zuckerberg About PRISM*, Facebook Newsroom (June 8, 2013), available at https://about.fb.com/news/2013/06/personal-response-from-mark-zuckerberg-about-prism/ (last accessed Apr. 1, 2021).

[209] Nicholas Carlson, *Zuckerberg: I Just Called Obama To Say How Mad I Am About The NSA*, Yahoo! News (Mar. 13, 2014), available at https://www.yahoo.com/news/zuckerberg-obama-nsa-damaging-future-192935379.html (last accessed Apr. 1, 2021) (emphases added).

Facebook.  That's why we have dedicated teams and intelligent security systems working around the clock to help keep your account secure."[210]

**l)**     Facebook's statement in its 2016 10-K filing that while "some of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook[,]" Facebook only "provide[s] **limited information to such third parties** based on the scope of services provided to us."[211]

**m)**     Mark Zuckerberg's March 2016 public statement in response to a statement issued by its subsidiary, WhatsApp, assuring that "Facebook stands with many technology companies to protect you and your information."[212]

**n)**     Mark Zuckerberg's March 12, 2017 public statement, posted on his Facebook page, that "[k]eeping the global community safe is an important part of our mission – and an important part of how we'll measure our progress going forward" and reassurance that "[k]eeping our community safe does not require compromising privacy."[213]

**o)**     Mark Zuckerberg's March 21, 2018 statement following news outlets' reporting on the Cambridge Analytica scandal that "[w]e have a responsibility to protect your data, and if we can't then we don't deserve to serve you."[214]

---

[210] Melissa Luu-Van, *Enhancing Security with a Quick Checkup*, Facebook Newsroom (July 30, 2015), available at https://about.fb.com/news/2015/07/enhancing-security-with-a-quick-checkup/ (last accessed Apr. 1, 2021).

[211] Form 10-K Filing for Facebook, Inc., Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1326801/000132680117000007/fb-12312016x10k.htm (last accessed Apr. 1, 2021) (emphasis added).

[212] Anita Balakrishnan, Sara Salinas, and Matt Hunter, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC (Apr. 9, 2018), available at https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html (last accessed Apr. 1, 2021).

[213] Mark Zuckerberg, *Building Global Community*, Facebook (Mar. 12, 2017), available at https://www.facebook.com/notes/mark-zuckerberg/building-global-community/10154544292806634?qid=339663931&amp%3Bmf_story_key=10103508221158471 (last accessed Apr. 1, 2021).

[214] *Facebook's Zuckerberg speaks out over Cambridge Analytica 'breach'*, BBC News (Mar. 22, 2018), available at https://www.bbc.com/news/world-us-canada-43494337 (last accessed Apr. 1, 2021).

239. Facebook's statements regarding its commitments to its users' privacy and its representations regarding its collection and sharing of their data were false, or, at a minimum, omitted material facts that would be necessary to make these statements not misleading. These representations left the false impression that Facebook allowed its users to choose specifically what data Facebook could collect, to whom that data would be shared, and how it would be used.

240. Plaintiffs and Class members did not discover, nor could they have discovered through reasonable diligence, that Facebook was deceiving them and violating the antitrust and other laws until less than four years before this litigation was initially commenced. Facebook did not tell Plaintiffs or other Class members that it was violating its 2011 Settlement with the FTC, deceiving consumers and selling their data to extract revenue from third parties, or exploiting consumers' trust by surveilling them and using their data to identify competitors to "acquire, copy, or kill."

241. To the contrary, Mark Zuckerberg—Facebook's founder, Chief Executive Officer, and public face—repeatedly represented otherwise. Indeed, in announcing its largest-ever $5 billion fine against Facebook following the Cambridge Analytica scandal, the FTC explained that Facebook "encourages users to share information on its platform" by "promis[ing] users they can control the privacy of their information," but that Facebook "repeatedly used deceptive disclosures and settings to undermine users' privacy preferences[.]"

242. In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiffs and Class members did not—and could not—discover Facebook's scheme, even with the exercise of reasonable diligence.

243. Plaintiffs and Class members attempted to exercise reasonable diligence in maintaining the safety, security, and privacy of their data. That is why—based upon Facebook's avowed commitments to its users' privacy—Plaintiffs and Class members used Facebook and its various product offerings. Plaintiffs and Class members, however, did not discover, and could not have reasonably discovered, their claims through the exercise of reasonable diligence until

1  consulting with counsel shortly before the filing of this action, and in any event, no earlier than
2  March 2018.

**D.    Continuing Violations and Ascertainment of Damages**

4      244.    Since the start of the class period, Facebook has committed continuing violations of
5  the antitrust laws, resulting in monetary injury to Plaintiffs and Class members.  As described
6  herein, Facebook has engaged in a pattern of independent misrepresentations to users, designed to
7  acquire, maintain, and prolong Facebook's monopoly position.    Similarly, Facebook has
8  weaponized its users' data as a part of its serial acquisition strategy to "acquire, copy, or kill" its
9  competitors.

10     245.    Each of these injurious acts were separate and independent overt acts during the
11 limitations period that were new and independent acts that inflicted new and accumulating injuries
12 on consumers.  Each of Facebook's instances of deception as to its data privacy practices and
13 commercial surveillance over time were acts new and independent from its past issues with data
14 privacy and commercial surveillance.  Facebook's continued exposure of private information to
15 app developers, advertisers, and other third parties leading up to 2018, as well as its anticompetitive
16 acquisition practices, were additional, independent, and overt acts that harmed competition and
17 inflicted new and accumulating economic injuries on consumers.

18     246.    Moreover, Plaintiffs' and Class members' harms were not ascertainable—sufficient
19 to give rise to the claims presented herein—more than four years prior to the date that this action
20 was first commenced.  Since the harm that Plaintiffs and Class members allege had not crystallized
21 more than four years prior to the date that this action was initiated, the antitrust claims presented
22 herein are timely.

**VI.    CLASS ACTION ALLEGATIONS**

24     247.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained
25 above.

26     248.    Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs assert claims on
27 behalf of **The Consumer Class:** All persons in the United States who maintained a Facebook
28 profile at any point from 2007 up to the date of the filing of this action.  Excluded from the Class

are Facebook, any entity in which Facebook has an interest, and any of Facebook's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

249. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the Class can be done through Facebook's own records.

250. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Class numbers at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

251. Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including:

**a)** Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

**b)** Whether Facebook's acquisition conduct was anticompetitive;

**c)** Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

**d)** Whether Facebook is a monopolist in the Social Network Market;

**e)** Whether Facebook is a monopolist in the Social Media Market;

**f)** Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

**g)** Whether Facebook's foreclosure of competition in the Social Network Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

**h)** Whether Facebook's foreclosure of competition in the Social Media Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

i)      Whether consumers would have had more options and competition amongst social networks and social media companies if Facebook would have revealed the full extent of its data privacy practices and commercial surveillance long ago;

j)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Network Market in the United States;

k)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Media Market in the United States; and

l)      Whether Facebook's anticompetitive conduct should be enjoined or whether other appropriate equitable relief is just and proper, including ordering Facebook to divest assets or submit to more invasive third-party audits of its privacy practices and commercial surveillance.

252.    Plaintiffs are members of the putative Consumer Class.  The claims asserted by Plaintiffs in this action are typical of the claims of the members of the putative Consumer Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

253.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Consumer Class, as their interests are coincident with, not antagonistic to, the other members of the Consumer Class.

254.    Plaintiffs have retained counsel competent and experienced in both antitrust and class action litigation.

255.    Certification of the Consumer Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.  Absent a class action, it would be unlikely that many members of the Consumer Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

256.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous

1    individual actions and the duplication of discovery, effort, expense, and the burden of the courts

2    that individual actions would create.

3           257.    In the alternative, the Consumer Class should be certified because:

4           **a)**    The prosecution of separate actions by the individual members of the

5    proposed class would create a risk of inconsistent adjudications, which could establish incompatible

6    standards of conduct for Facebook;

7           **b)**    The prosecution of individual actions could result in adjudications, which as

8    a practical matter, would be dispositive of the interests of non-party class members or which would

9    substantially impair their ability to protect their interests; and

10          **c)**    Facebook has acted or refused to act on grounds generally applicable to the

11   proposed Consumer Class, thereby making appropriate final and injunctive relief with respect to

12   the members of the proposed Consumer Class as a whole.

13                          **VII.    INTERSTATE TRADE AND COMMERCE**

14          258.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

15   above.

16          259.    Facebook's anticompetitive conduct has taken place in, and negatively affected the

17   continuous flow of interstate trade and commerce in the United States in that, *inter alia*:

18          **a)**    Facebook has provided a social network and social media applications and

19   has exchanged consumer information and attention with advertisers and consumers throughout the

20   United States;

21          **b)**    Facebook has used instrumentalities of interstate commerce to provide social

22   network and social media services to consumers and advertisers throughout the United States;

23          **c)**    In furtherance of the anticompetitive scheme alleged herein, Facebook has

24   traveled between states and exchanged communications through interstate wire communications

25   and via the Unites States mail; and

26          **d)**    The anticompetitive scheme alleged herein has affected billions of dollars of

27   commerce.  Facebook has inflicted antitrust injury by artificially raising the cost to consumers of

28   using its products, in terms of personal information and attention, by providing reduced user privacy

protections to consumers in exchange for their personal data, and by artificially reducing consumer choice and competition in the Social Network and Social Media Markets in the United States.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: MONOPOLIZATION OF SOCIAL NETWORK MARKET

#### Sherman Antitrust Act, § 2

#### (On behalf of the Consumer Class)

260.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

261.     Facebook has willfully acquired and maintained monopoly power in the relevant Social Network Market.  There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements.  Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social network quality than would occur in a world where Facebook had not illegally monopolized the Social Network Market.  Facebook has the power to control prices and exclude competition in the Social Network Market.

262.     By multiple measures, Facebook has dominant market share in the Social Network Market.  As discussed more fully below, Facebook's market share in the Social Network Market is higher than its share in the Social Media Market.  And, more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

263.     High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Network Market in the United States to compete effectively with Facebook.

264.     Facebook has willfully acquired and maintained monopoly power in the Social Network Market by means of predatory, exclusionary, and anticompetitive conduct.  Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's

data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

265.    By eliminating competition and obtaining and maintaining monopoly power over the Social Network Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

266.    Facebook's destruction of competition caused antitrust injury to Plaintiffs and Consumer Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits.  Plaintiffs and the Consumer Class were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

267.    During the relevant period, Plaintiffs and Consumer Class members gave Facebook their personal data and attention in exchange for the use of its social network.  As a result of Facebook's illegal conduct, Plaintiffs and other Consumer Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

268.    There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

269.    Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

270.    Facebook's conduct has had a substantial effect on interstate commerce.

271.    Plaintiffs and Consumer Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

272.    Plaintiffs and Consumer Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a)

1    lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being

2    forced to accept a service of lesser quality because of reduced competition.

3        273.    Plaintiffs and Consumer Class members seek an award of treble damages or, in the

4    alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable

5    relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment

6    of consumers and to remedy the harms that Facebook's monopolization of the Social Network

7    Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly

8    power; and (b) requiring Facebook to submit to independent monitoring of its user privacy

9    practices, data surveillance, and acquisition conduct.

10   **SECOND CLAIM FOR RELIEF: ATTEMPTED MONOPOLIZATION OF SOCIAL**

11   **NETWORK MARKET**

12   **Sherman Antitrust Act, § 2**

13   **(On behalf of the Consumer Class)**

14       274.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

15   above.

16       275.    With respect to the Social Network Market, Facebook has engaged in predatory,

17   exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market share

18   through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers

19   through deception to systematically destroy competition through its strategy to "copy, kill, or

20   acquire" any and all of its competitors.

21       276.    Facebook's conduct has had an anticompetitive effect in the Social Network Market.

22       277.    Facebook's conduct has no legitimate business purpose or procompetitive effect,

23   and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive

24   effects.

25       278.    Facebook has engaged in the anticompetitive conduct described herein with the

26   specific intent of monopolizing the Social Network Market.

27       279.    Facebook has engaged in the anticompetitive conduct described herein with a

28   dangerous probability of monopolizing the Social Network Market.

1        280.    Facebook's conduct has had a substantial effect on interstate commerce.

2        281.    Plaintiffs and Consumer Class members have been, and will continue to be, injured

3    in their property as a result of Facebook's conduct.

4        282.    Plaintiffs and Consumer Class members have suffered, and will continue to suffer,

5    injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a)

6    lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being

7    forced to accept a service of lesser quality because of reduced competition.

8        283.    Plaintiffs and Consumer Class members seek an award of treble damages or, in the

9    alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable

10   relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment

11   of consumers and to remedy the harms that Facebook's attempted monopolization of the Social

12   Network Market has caused, including: (a) divestment of assets that would continue to entrench its

13   monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user

14   privacy practices, data surveillance, and acquisition conduct.

15   **THIRD CLAIM FOR RELIEF: MONOPOLIZATION OF SOCIAL MEDIA MARKET**

16                          **Sherman Antitrust Act, § 2**

17                        **(On behalf of the Consumer Class)**

18       284.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

19   above.

20       285.    Facebook has willfully acquired and maintained monopoly power in the relevant

21   Social Media Market.  There are no reasonably interchangeable products that would effectively

22   constrain, or have effectively constrained, Facebook from imposing and profitably sustaining

23   during the relevant period a significant artificial decrease in compensation to consumers for their

24   user information and attention paid to advertisements.  Facebook also has the power to impose and

25   profitably sustain lower levels of data privacy protections and social media quality than would

26   occur in a world where Facebook had not illegally monopolized the Social Media Market.

27   Facebook has the power to control prices and exclude competition in the Social Media Market.

28

286.   By multiple measures, Facebook has dominant market share in the Social Media Market.  As measured by advertising revenue that is generated by social media applications in the Social Media Market, Facebook (including Instagram) has market share of at least 85% of the Social Media Market.  By its own measure, and as reflected in Facebook's internal documents, Facebook has estimated that it is "95% of all social media in the US[.]"  And, more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

287.   High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Media Market in the United States to compete effectively with Facebook.

288.   Facebook has willfully acquired and maintained monopoly power in the Social Media Market by means of predatory, exclusionary, and anticompetitive conduct.  Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

289.   By eliminating competition and obtaining and maintaining monopoly power over the Social Media Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

290.   Facebook's destruction of competition caused antitrust injury to Plaintiffs and Consumer Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits.  Plaintiffs and Antitrust Consumer Class members were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

291. During the relevant period, Plaintiffs and Consumer Class members gave Facebook their personal data and attention in exchange for the use of its social media offerings. As a result of Facebook's illegal conduct, Plaintiffs and other Consumer Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

292. There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

293. Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

294. Facebook's conduct has had a substantial effect on interstate commerce.

295. Plaintiffs and Consumer Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

296. Plaintiffs and Consumer Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

297. Plaintiffs and Consumer Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**FOURTH CLAIM FOR RELIEF: ATTEMPTED MONOPOLIZATION OF SOCIAL**

**MEDIA MARKET**

**Sherman Antitrust Act, § 2**

**(On behalf of the Consumer Class)**

298.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

299.   With respect to the Social Media Market, Facebook has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers through deception to systematically destroy competition through its strategy to "copy, kill, or acquire" any and all of its competitors.

300.   Facebook's conduct has had an anticompetitive effect in the Social Media Market.

301.   Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

302.   Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Social Media Market.

303.   Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Media Market.

304.   Facebook's conduct has had a substantial effect on interstate commerce.

305.   Plaintiffs and Consumer Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

306.   Plaintiffs and Consumer Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

307.   Plaintiffs and Consumer Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable

relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

## FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT

### California Common Law

### (On behalf of the Consumer Class)

308.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

309.    Facebook has been unjustly enriched through its misconduct as alleged herein.

310.    Plaintiffs and Consumer Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

311.    These benefits are quantifiable in measurable units.  Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts.  In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.  That year, Facebook itself reported that its ARPU was over $41.00 per user in the United States and Canada.

312.    Facebook appreciated and had knowledge of the fact that Plaintiffs and Consumer Class members conferred these benefits on it.  For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiffs and Consumer Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you."  That Facebook internally tracks the time its users spend on Facebook (and its family of products) and compares these figures to the time they spend on other competing services further makes clear that Facebook recognizes Plaintiffs and Consumer Class members have conferred on it the benefits of their time and attention.

313.     Facebook acquired these benefits from Plaintiffs and Consumer Class members through the misrepresentations and deception it and its executives publicly promulgated.  Facebook induced Plaintiffs and Consumer Class members to join Facebook based on the promise of stringent privacy protections.  All the while, Facebook concealed the scope of the data it harvested from Plaintiffs and Consumer Class members and brokered to third parties.  Nor did Facebook reveal the manner in which it weaponized Plaintiffs' and Consumer Class members' data to "copy, kill, or acquire" Facebook's rivals.

314.     As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Consumer Class members' data, time, and attention, Facebook was able to destroy competition, enriching itself at the expense of Plaintiffs and Consumer Class members.  Although Plaintiffs and Consumer Class member conferred on Facebook the direct benefits of their data, time, and attention, Plaintiffs and Consumer Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

315.     Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein.  In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.  It would be unfair, unscrupulous, unjust, and inequitable to allow Facebook to retain the value it derived from the direct benefits that Plaintiffs and Consumer Class members conferred upon it.

316.     To the extent that it is required—and solely in the alternative—Plaintiffs and Consumer Class members have no other adequate remedy at law available.

317.     Plaintiffs and Consumer Class members in all of the 50 States and the District of Columbia accordingly seek disgorgement of all of Facebook's profits resulting from the wanton misconduct alleged herein.

## IX.     **PRAYER FOR RELIEF**

318.     WHEREFORE, Plaintiffs Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho, on behalf of themselves and the Consumer Class, seek the following relief:

a)   An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Consumer Class as requested herein, finding that Plaintiffs are proper representatives of the Consumer Class requested herein, and appointing Plaintiffs' counsel as Consumer Class Counsel.

b)   Injunctive and other equitable relief as is necessary to protect the interests of the Consumer Class, including: (i) an order prohibiting Facebook from continuing to engage in the wrongful acts described herein; and (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition conduct, and ordering them to promptly correct any problems or issues detected by these auditors.

c)   Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and Consumer Class members.

d)   Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre-judgment and post-judgment interest on any amounts awarded, for corrective advertising to ameliorate consumers' mistaken impressions created by Facebook's anticompetitive conduct.

e)   Declaratory relief, including but not limited to a declaration and judgment that Facebook's conduct as alleged herein violates the laws alleged herein.

f)   Such other relief as the Court may deem just and proper, such as divestiture of assets that entrench Facebook's monopoly power.

## X.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury in this action of all issues so triable.

DATED:  April 22, 2021               Respectfully submitted,

By /s/ *Shana E. Scarlett*            By /s/ *Stephen A. Swedlow*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
  steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
  wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
  rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
  bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
  rapeterson@locklaw.com
Arielle S. Wagner (admitted *pro hac vice*)
  aswagner@locklaw.com
Stephanie A. Chen (admitted *pro hac vice*)
  sachen@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)
  stephenswedlow@quinnemanuel.com
Michelle Schmit (admitted *pro hac vice*)
  michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Manisha M. Sheth (admitted *pro hac vice*)
  manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

**KELLER LENKNER LLC**
Warren Postman (Bar No. 330869)
  wdp@kellerlenkner.com
Jason Ethridge (admitted *pro hac vice*)
  jason.ethridge@kellerlenkner.com
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (admitted *pro hac vice*)
  ack@kellerlenkner.com
Ben Whiting (admitted *pro hac vice*)
  ben.whiting@kellerlenkner.com
Jason A. Zweig (admitted *pro hac vice*)
  jaz@kellerlenkner.com
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*Interim Counsel for the Consumer Class*

## <u>ATTESTATION OF STEPHEN A. SWEDLOW</u>

This document is being filed through the Electronic Case Filing (ECF) system by attorney Stephen A. Swedlow.  By his signature, Mr. Swedlow attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 22, 2021        By  */s/ Stephen A. Swedlow*
                                  Stephen A. Swedlow

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of April 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By  */s/ Stephen A. Swedlow*
                        Stephen A. Swedlow